# Richmond

## C. A. CLYBORNE, ET AL. v. MARY R. MCNEIL, ET AL.

April 25, 1960.

Record No. 5059.

Present, All the Justices.

The opinion states the case.

*William A. Stuart* and *Carl C. Gillespie*, for the appellants.

*E. Claude Pobst* and *Marjorie Coleman* (*Pobst & Coleman*, on brief), for the appellees.

BUCHANAN, J., delivered the opinion of the court.

This is a declaratory judgment proceeding brought by the appellees to have interpreted a coal mining lease made by them as lessors to the predecessors of the appellants as lessees, dated August 1, 1948. By the lease the lessors demised and leased to the lessees, their heirs, successors and assigns, the exclusive right to mine and remove "by deep mining or strip mining methods, or both," all the merchantable and mineable coal on a tract of land on Dismal River in Buchanan county containing 750 acres, for which the lessees agreed to pay to the lessors 15 cents a ton, to be "determined by actual weight."

This tract of land had been owned by John G. McNeil, who devised 30 acres of it to his wife, Mary R. McNeil, for life, then to his daughter Stella McNeil, and to his daughters Virgie Clifton and Macie Salyers jointly "the fields and flats in front of Whitewood Post Office," which contained 15 acres lying on the north side of the tract along the river. These two daughters later by deed divided the 15-acre tract between them and built homes thereon. The rest of the 750 acres was devised to the wife and three daughters jointly. These four and the husbands of Virgie Clifton and Macie Salyers were the lessors, and are now the appellees. The lessees were J. H. Frank, W. M. Culbertson, Jr., and C. A. Clyborne. The first two assigned their interests to Clyborne. Clyborne assigned to Paragon Jewell Coal Company, Inc., of which he is an officer and principal stockholder, and these two are the appellants and herein called the lessees.

The pleadings and the evidence related primarily to these two questions: (1) Whether the lessees had the right to transport by trucks over the surface of the demised premises to their tipple and processing plant thereon coal mined from mines belonging to others (referred to herein as "outside coal") without paying for that privilege; (2) Whether the lessees had the right to make a deduction of 2½ per cent from the 15 cents per ton royalty provided for in the

lease, because of impurities in the coal mined from the leased premises and delivered to the tipple.

The first question involves the proper construction of Articles IV, X, and part of XIX of the lease contract.*

* Article IV.

"It is further agreed that the Lessees shall have the right to use all of the surface of said land as is now owned in fee simple by the said Lessors for the purpose of mining said coal, the construction of any and all other buildings necessary for the carrying on of said mining operation. There is, however, excepted from this right or privilege granted to the Lessees the following:

"1. All the cleared land under fence on the portion of land now used and occupied by Macy Salyers, with the exception that the said Lessees may have the right to construct a tipple on the east end of said tract.

"2. All the cleared land running with the lower end of the said tract hereby leased on the portion now used and occupied by Virgie Clifton, with the exception that the said Lessees may have the right to construct a tipple on the west end or portion of said land. It is, however, agreed between the parties hereto that the said Lessees may have a right of way for railroads, or truckroads, or other means of transportation on the lands of the said Macy Salyers and Virgie Clifton.

"3. There is also excepted all the land under fence on the home place of the said Mary McNeil, with the exception that the said Lessees may have the right and privilege of using the truckroad that is already constructed and in use over and through said property, which said road is to be improved and maintained by the said Lessees at their own expense, leading to and from the State Highway. It is agreed between the parties hereto that the said Lessees in making use of said road will indemnify and save harmless the said Mary McNeil, her heirs or assigns, from any damages which she or they may sustain by reason of said road being so used by the said Lessees."

Article X.

"The said Lessees shall have the right to use the entries, haulways, or other excavations in said mine for the purpose of hauling through said land the coal leased or purchased from any other person than Lessors, but the said Lessees shall pay to the said Lessors two and one-half (2½¢) cents for each and every ton of coal acquired or purchased from any other persons than Lessors and hauled through any of said entries, gangways, excavations, or haulways through the leased premises, and shall keep a book of accounts showing every ton of coal mined from other lands and hauled through any of the excavations, entries, or haulways on the leased premises, and pay therefor at the rate of two and one-half (2½¢) cents per ton for each ton so hauled, each month at the same time the royalties herein provided to be paid shall be due and payable. However, the Lessors do hereby grant the Lessees the right and privilege to haul Lessee's own coal purchased, owned, or leased over lands leased by Lessees from Lessors on the truckroads, or roads now on the leased premises free of charge. Provided, however, the said Lessees agree to maintain and upkeep the truckroads, or other roads at their own expense."

Article XIX.

"It is further understood and agreed between the parties hereto that the said Lessees, their successors or assigns, shall have the right to construct railroads, tramroads, haulroads, or tipples or other necessary structures upon said leased premises for the purpose of mining said coal . . .."

The lessors contended that the Clifton and Salyers 15-acre tract was excepted from the lease (the Mary R. McNeil 30 acres was not involved in the controversy because no hauling was done on that tract); that the lessees were not entitled to haul outside coal over the surface of this tract or over the rest of the jointly-owned and undivided 750 acres; that in doing so they were trespassers and liable for damages in the sum of at least 5 cents a ton; that the owners of the Clifton and Salyers land were entitled to be paid separately for the hauling done over their respective tracts apart from the wheelage, or payment for hauling, over the undivided land.

The lessees contended that the Clifton-Salyers tracts were included in the lease; that all of their hauling over the surface of the leased premises was to be free of charge; that the only wheelage charge it was required to pay was for underground hauling provided for in Article X of the lease, which should be paid jointly to all the lessors.

From the evidence submitted by depositions it was shown that the Norfolk and Western Railway right of way runs along the north front of the Salyers-Clifton tract and immediately north of the right of way is Dismal River. Immediately north of the river is the State highway, following the river. After the lease was assigned by Clyborne to Paragon, the latter constructed a tipple and large processing plant on the east end of the Salyers tract, as permitted by Article IV, paragraph 1, of the lease, and built a new bridge from the highway across the river. From the end of the bridge it built a road across the Clifton and Salyers land to the tipple and processing plant, following the general course of a road already on the premises, but at points several feet distant from the old road. It also constructed a road southwardly past the tipple toward the undivided land following generally the old road to near the Salyers line and then continuing as a new road into the undivided land. A short distance north of the end of the old road Paragon constructed a new road westwardly several hundred feet toward a tract of 889 acres owned by the Brown heirs and under lease to Paragon. This road followed generally the outcrop of the Red Ash coal seam on the demised premises with side roads toward the outcrop. A map was filed in evidence showing in different colors the old road and the new construction.

In addition to the coal on the McNeil property, Paragon leased or bought the coal on a number of other tracts of land in the sur-

rounding area, including the Brown property mentioned, the owners of which were in no way connected with the McNeil property. It did not itself mine the coal so owned by it, but contracted with others to mine it, load it on trucks and haul it to the tipple, for which they were paid by Paragon on a per ton basis.

Some of this outside coal was hauled through the underground passages in the McNeil property, for which Paragon paid the lessors $2\frac{1}{2}$ cents a ton as provided in Article X of the lease. Most of the outside coal however was hauled by the contractors in trucks over the roads built by Paragon on the surface of the leased premises as above described. There were 32 of these contractors at the time of the depositions and they operated 75 to 100 trucks a day over these surface roads, or some of them, carrying an average of ten tons per truck. In the period from October, 1951, when operations began, to August, 1955, more than a million tons of coal were hauled in this fashion over the leased premises to the tipple and processing plant. This is the hauling for which lessors say they should be paid.

After the cause was submitted the court rendered a written opinion dealing with the points in dispute and in accordance therewith entered the decree appealed from adjudicating: (1) That the leased premises included all the McNeil land; *i.e.*, that the Clifton-Salyers tract was not excepted therefrom; (2) that the provision of Paragraph 2 of Article IV of the lease that "the said Lessees may have a right of way for railroads, or truckroads, or other means of transportation on the lands of the said Macy Salyers and Virgie Clifton," was only for the purpose of mining and removing the coal on the leased premises, and for outside coal hauled over these tracts the lessees would have to pay $2\frac{1}{2}$ cents a ton as provided in Article X; (3) that Paragon was entitled under Article IV of the lease to construct, maintain and use, free of charge, such new truckroads and other roads on the Clifton and Salyers land, as well as on the jointly-owned land, as reasonably necessary for mining and removing the coal from the demised premises; (4) that under Article X of the lease Paragon had the right to use said new truckroads or other new roads over the surface of the said lands for hauling outside coal by paying $2\frac{1}{2}$ cents a ton for that privilege (but could use free of charge, for that purpose, the truckroads or other roads already on said tracts when the lease was made); (5) that the language used in Article X with reference to the use of entries, gangways, excavations and haulways, meant those on the surface as well as those under ground; (6) that

the 2½ cents a ton for hauling outside coal was payable to the lessors jointly; (7) that the testimony was insufficient to establish the weight of the impurities, if any, in the coal mined from the leased premises, and that the lessors were entitled to recover the amount heretofore deducted by the lessees from the royalty payments on that account.

By their assignments of error the lessees, appellants, challenged holdings (2), (4)—except the part in parentheses; (5) and (7). The lessors, appellees, assigned cross-error to holdings (1); (2) and (4)—in holding that the lessees had any right under the lease to haul outside coal over any roads on any of the lands; (5) and (6).

The lessees argue that in the negotiations for the execution of the lease the lessors were informed of their plans to construct a preparation plant on the leased premises and to haul outside coal over these premises to the plant, and that it was agreed in the negotiations that the lessees would be paid 2½ cents a ton for such of this outside coal as was hauled underground but nothing for that hauled over the surface. The lessors deny that there was such an understanding, and say that obviously they would not have agreed to a contract which required payment for hauling through underground passages, resulting in little, if any, actual damage to their land, yet make no charge for hauling over new roads to be built on the surface, the construction of which, as shown by pictures in evidence, made deep cuts in the surface and the use of which by the heavily-loaded coal trucks was almost constant.

The parties entered into a written contract which must be looked to first to ascertain what was agreed and what was not agreed. To ascertain this the entire instrument must be examined and not disjointed parts of it. If its language is clear, then evidence having the effect to vary, alter or contradict it cannot be considered. If its meaning is ambiguous, its language is to be construed most strongly against the grantors, and the facts and circumstances of its execution may be examined in aid of construction, but not to vary or contradict its plain terms. The written contract is the repository of the agreement and prior negotiations on the subjects dealt with are merged in it. Courts cannot read into contracts language which will add to or take from the meaning of what the parties have written. *Stonegap Colliery Co.* v. *Kelly*, 115 Va. 390, 79 S. E. 341; *Virginian Ry. Co.* v. *Avis*, 124 Va. 711, 98 S. E. 638; *Bolling* v. *Hawthorne Coal Co.*, 197 Va. 554, 90 S. E. 2d 159; *Duke* v. *Tobin*, 198 Va. 758, 96 S. E. 2d 758.

■ By Article IV of the lease the lessees were granted the right to use all of the surface of the 750 acres "for the purpose of mining said coal," and for the construction of all necessary buildings for said purpose; but there is excepted from this right certain described parts of the Clifton and Salyers tracts and of the Mary McNeil tract. The exception is not from the lease but from the right mentioned. It is clear that the Clifton and Salyers tracts were not otherwise excluded from the lease.

Article IV deals with the rights for mining coal on the leased property. In Paragraph 2 the exceptions themselves are made subject to the exception that the lessees "may have a right of way for railroads, or truckroads, or other means of transportation on the lands of the said Macy Salyers and Virgie Clifton." It is clear that this provision applies to the mining of "said coal" on the leased premises, which is the subject of the Article, and confers no right to exercise that privilege with respect to outside coal. This is emphasized by the language of Article XIX, granting to the lessees, their successors or assigns, "the right to construct railroads, tramroads, haulroads, or tipples or other necessary structures upon said leased premises for the purpose of mining said coal . . ."

Article X of the lease provides that the lessees shall have the right "to use the entries, haulways, or other excavations in said mine" for hauling "through said land" outside coal, but shall pay 2½ cents a ton for each ton "hauled through any of said entries, gangways, excavations, or haulways through the leased premises," and shall keep account of every ton so hauled "through any of the excavations, entries, or haulways on the leased premises;" *however* the lessees are granted the right to haul the outside coal over the leased premises "on the truckroads, or roads now on the leased premises free of charge."

The lessees contend that this "however" clause gives to them the right to haul all of their outside coal over the surface of the leased premises free of charge, not only over the roads existing at the date of the lease, but also over the roads constructed by them after the date of the lease, which are shown on the map above referred to. They say that it is undenied that the coal truck traffic could not be operated on the old road and that it had to be relocated and reconstructed so as to make it usable for the purpose of the lease; that the lessees did not contemplate paying any wheelage charge for outside coal hauled on the surface, but only for underground haulage

through the mine workings on the McNeil land. Further, they say that since there were no real truckroads on the property at the time of the lease, the reference must be to truckroads to be constructed by the lessees thereafter, and that the words "free of charge" must therefore refer both to truckroads to be constructed as well as to roads already there.

The language of the lease, however, is too plain to bear that construction. There is no question as to the road that existed on the leased premises at the time of the lease. It is shown in red on the map and its location and character are not in dispute. It is referred to as a truckroad in Paragraph 3 of Article IV of the lease. Part of it had been used for trucking logs. It is referred to in its entirety in the "however" clause as truckroads or roads. Even though not adequate to carry the truck traffic afterwards developed by the lessees, nevertheless it was by the clear language of the lease the only surface road which the lease permitted to be used free of charge for hauling outside coal.

Lessees argue that nowhere in the lease, in Article X or elsewhere, is there any mention of requiring payment of wheelage for the use of the surface for truckroads. It is equally true that nowhere in the lease except in Article X is there any grant of any right to haul outside coal over the leased premises. In the absence of such right granted by the lease, the lessees would be in that respect trespassers and liable to the lessors for the fair value of that use, which the lessors say is at least 5 cents a ton according to the evidence. *Clayborn* v. *Camilla, Etc., Coal Co.*, 128 Va. 383, 105 S. E. 117; *Raven Red Ash Coal Co.* v. *Ball*, 185 Va. 534, 39 S. E. 2d 231; *Preston Mining Co.* v. *Matney*, 197 Va. 520, 90 S. E. 2d 155.

The trial court in its well-reasoned opinion found, and accordingly decreed, that the lessees had the right under Article X to transport outside coal over the surface roads by paying 2½ cents a ton for that privilege. On this subject the court said:

". . . The lease grants to the lessees their successors or assigns the exclusive right and privilege of removing by deep mining or strip mining methods, or both, all the merchantable coal on the land covered by the lease. It is common knowledge in coal mining areas that mining coal by the strip mining method means that method by which the surface or strata overlying the coal is removed in order that the coal may be taken out without any underground operation and the haulways are necessarily upon the surface. The use of the

entries, haulways or excavations referred to would, therefore, include not only those used in mining the leased coal by the deep mining method but also those used in mining by the strip mining method, and the roads or haulways contemplated by the parties were not limited to those underground but also included the use of such roads or haulways upon the surface as would be reasonably necessary to construct and use in mining the leased coal."

We agree with that construction, which finds additional support in the fact that the lease provided that new roads might be constructed on the leased premises, and in Articles IV and XIX that the lessees might use all the surface of the demised premises, with stated exceptions, and might construct railroads, tramroads and haulways thereon for the purpose of mining and removing the coal from the leased premises; and in the fact that these new roads were used in mining the McNeil coal.

Since the beginning of operations, and over the protest of the lessors, the lessees have deducted, in accounting for the 15 cents a ton royalty, 50 pounds (or 2½ per cent) from each ton of coal mined from the leased premises, on the ground that there were impurities in the coal, such as rock, slate and other substances, shoveled up with the coal and loaded in the trucks in the hand-loading method used in mining the coal. Such impurities would be cast aside in the lessees' processing plant, resulting in a difference between the truck weights and the railroad weights. The lessees were paid by their customers on the basis of the railroad weights. Clyborne testified that "it has been regarded more or less a custom that 50 pounds is very reasonable as net tolerance and to take care of scale tolerance and rejects."

The seam of coal mined on the leased premises is known as the Red Ash seam, a premium coal of high quality, so Clyborne testified. Several witnesses for the lessees testified that such a deduction was a common practice in the truck mining business in this general area, but their experience included the mining of coal seams known to contain a relatively high percentage of impurities. Culbertson testified that the amount of impurities in a coal seam changes in each coal seam and in each vicinity. Nobody testified as to the presence of impurities in the coal mined from the McNeil land.

Clifton testified that he had examined the Red Ash seam on the McNeil land, and it had no impurities or partings in it; that the roof over the seam and the bottom under it were of sandstone and that there should be no rejects if the coal was properly mined.

The trial court held that a deduction for impurities was allowable if adequately proved but that in view of the evidence for the lessors that the coal on the leased premises was clean coal, testimony that there were impurities in other coal mined in the general area was not adequate to sustain Paragon's burden of proving the amount of impurities in the McNeil coal.

The coal mined from the McNeil land was hauled to the tipple in separate trucks and separately weighed and dumped. It should have been a simple matter to have made some inspection or tests to ascertain with a reasonable degree of accuracy the percentage of rock, slate or other impurities in a sampling of truck loads. The lessees were not entitled to make such deduction merely on the basis of a practice prevailing among other operators mining other seams in other areas.

The decree appealed from directed that a special commissioner be appointed at a later date for the purposes stated in the opinion, one of which was to ascertain whether the lessees had constructed or used new roads on the leased premises which were not reasonably necessary for the successful mining and removal of the coal on the leased premises. While the lessors alleged in their petition for a declaratory judgment that the lessees had constructed more roads than were necessary, they introduced no evidence to support that allegation. In their brief they say only that the court has directed that a commissioner shall make a report on that point and until it is made and filed there is no necessity for any argument about it. The evidence for the lessees was that the roads constructed by them were necessary to the mining of the coal on the leased premises. This evidence stands undenied and since there is no issue on the question, it should not be referred to the commissioner. The decree appealed from is modified in that respect and as so modified is affirmed.

*Modified and affirmed.*