**J. M. MULLINS et al., Appellants,**

v.

**BEATRICE POCAHONTAS COMPANY,**
**Appellee.**

**No. 14298.**

United States Court of Appeals,
Fourth Circuit.

Argued June 3, 1970.

Decided Oct. 9, 1970.

Robert T. Winston, Norton, Va., and Carl W. Newman, Appalachia, Va., for appellants.

Robert L. Dolbeare, Richmond, Va. (E. Milton Farley, III, and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., Francis W. Flannagan, and Woodward, Miles & Flannagan, Bristol, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and LEWIS, District Judge.

BUTZNER, Circuit Judge:

The Beatrice Pocahontas Company mines and processes coal in Buchanan County, Virginia, near the communities of Keen Mountain and Oakwood. A number of people living and working in this area brought an action for damages and injunctive relief alleging that coal dust from the company's processing plant contaminates the air. The district court granted summary judgment against all of the property owners who derived title to their land from deeds that conferred mineral rights on Pocahontas.[1] We reverse because we believe that under Virginia law the deeds do not empower Pocahontas to process coal by methods which unreasonably impair the use of the surface.[2]

I.

The Beatrice Pocahontas plant was built in 1964 to crush, size, and clean 8,000 tons of coal a day. The chief source of the complaint about the dust is the drying process.[3] Fine coal, under $\frac{3}{8}$ inches in size, is cleaned by washing. From the washers it moves to dryers where hot gas dries the coal and picks up dust. Each dryer is designed to extract the dust from the hot gas by forcing the exhaust to spiral through a set of 286 tubes and a wet scrubber. Because of corrosion the tubes frequently must be replaced, but the company has operated periodically without renewing them. The manufacturer of the scrubbers guaranteed that they would meet the requirements of the Alleghany County, Pennsylvania, code, which Pocahontas describes as the strictest of its type. Nevertheless the scrubbers permit quantities of dust to escape for seven to ten minutes whenever the drying operation is started or stopped. This occurs usually four times a day. The company has not tested the scrubbers to determine whether they comply with the manufacturer's guarantee.

The property owners contend that the discharge of the dust constitutes a nuisance so severe that it blackens lawns and trees, destroys crops, ruins the paint on buildings and corrodes cars and trucks. They contend that it is irritating and unwholesome to breathe. The company has not measured the amount of dust that it discharges, but it denies that it pollutes the air. It asserts that

1. Other plaintiffs whose title is not subject to Pocahontas' mineral rights were not dismissed.

2. Since this is a diversity case, we apply Virginia law. Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. Crushing the coal also creates dust, but this apparently has been satisfactorily controlled by a Pangborn collector, which consists of a series of cotton sateen bags through which dust laden air is pulled by a fan.

it is not guilty of any act or omission which has damaged the property owners. Additionally, it moved for summary judgment, claiming that under the terms of its mineral severance deeds it has the right to deposit any amount of dust on the appellants' properties. The district court, concluding that the deeds sus- tained Pocahontas' position, granted summary judgment.

## II.

Each of the appellants owns his property subject to one of four mineral severance deeds, whose relevant portions are quoted in the margin.[4] All of the

4. The Boyd deed conveys:

"All the coal, oil and gas on and underlying the following tracts or parcels of land and all the timber for mining purposes on said tracts or parcels of land as hereinafter set out, together with the rights of ingress and egress through and over said lands for the purpose of removing said coal, oil and gas without leaving any support for the overlying strata, and also the right of ingress and egress through and over said land to remove the coal, oil and gas which said second party or their assigns may acquire on any adjacent land and all other usual mining privileges necessary for the full enjoyment of the premises hereby granted."

The Vandikes deed conveys:

"Second. All coal, oil, gas, fire clay, and stone, in, on and under the following tract or parcel of land, and all timber from sixteen (16) inches in diameter and under, on 50 acres of said land which said 50 acres is bounded and described as follows:

"Together with, and as appurtenant to said coal, oil, gas, fire clay, stone and timber, subject to the exception hereinafter made, the rights of way for Excavating and mining said land, and sufficient surface for making drift mouths, air shafts, wells, and sufficient land on which to erect tipples, tanks, pipe lines, washers, pumping stations, coke ovens, miners houses, roads, railroads, and sidings, tram-roads, incline roads, chutes, and such other devices as is or may become necessary for the successful mining and manufacturing and removing said coal, oil, gas, fire clay and stone, in, on or underlying said tract of land herein after described on any adjacent tracts that the said party of the second part, or assigns may now or hereafter own or lease; and the said parties of the first part further grant unto the said Buchanan Coal and Coke Company, Incorporated, its successors or assigns, the right to take the entire body or bodies of coal, oil, gas, fire clay, stone and timber herein conveyed, off, through, under and over said lands without leaving any support for overlying strata, and without liability for any injury which may result from breaking of said strata, and the right of mining and removing said coal and other things herein conveyed, and of ventilating and draining the mines by such openings, ways and structures as shall be necessary for the safe, convenient and economical mining of said coal, oil, gas, fire clay and stone, and the further right of mining and transporting the coal, oil, gas, fire clay, stone and minerals, of and from other lands, through and by means of the openings, ways and structures upon and in the said land as well as over the same; also the right to take and use so much water and stone from said land as said mining purposes may require."

The Buchanan Coal & Coke deed conveys:

"All coal, oil, and gas, found, in, on and under, the following. described tract or parcel of land, and all timber from sixteen inches in diameter and under on Thirty-five acres of said land, lying on Mill Ridge which may be standing on said land at the beginning of mining operation, together with the rights of ways for excavating and mining Said land, and sufficient surface for making drift-mouths, air shafts, wells, and sufficient land on which to erect tipples, tanks, pipe lines, washers, pumping stations, roads, and sidings, tram-roads, incline roads, chutes, and such other devices as is necessary for the successful mining and manufacturing and removing said coal, oil, gas, on or underlying Said tract of land herein described, or any adjacent tracts that the said party of the second part, or assignees, may own or lease; and the said parties of the first part further grant unto the said Buchanan Coal & Coke Company, its Successors or Assignees, the right to take the entire body or bodies of coal, oil and timber herein conveyed, off, through, under and over said lands, without leaving any support for overlying Strata, and without liability for any injury which may result from breaking of said Strata, and the right of mining and removing said coal herein conveyed, and of ventilating and draining the mines by such openings, ways and structures as Shall be necessary for the Safe, convenient and economical mining of said coal, and oils,

deeds give Pocahontas the right to remove the coal lying within the boundaries of the land, the right to cross over the land in support of mining operations elsewhere, and the right to remove support for the surface without liability for subsidence. While the Boyd deed, executed in 1910, also grants Pocahontas "all other usual mining privileges necessary for the full enjoyment of the premises hereby granted," two earlier deeds are more explicit. The Buchanan Coal & Coke deed, executed in 1905, reserves the use of "sufficient surface" for driftmouths, air shafts and wells, and "sufficient land" for "tipples, tanks * * * chutes, and such other devices" necessary for coal mining. The Vandikes deed, executed in 1905, uses virtually the same language, although it is a bit more detailed.

The Red Jacket deeds are distinctive. They not only reserve mineral rights, but they also subdivide and convey the surface with a provision that the grantees waive damages from air pollution and dust. Indeed, the Red Jacket Coal Corporation, predecessor in title to Beatrice Pocahontas, created the Oakwood and Keen Mountain subdivisions where many of the appellants live.

With the exception of the descriptions of the lots, the deeds are similar. In paragraph one they reserve to the company all estates except the surface. The reservation includes coal and minerals, the right of prospecting and mining with a perpetual easement for underground haulways. They exonerate the company from liability for loss or damage to the surface of the lots or to buildings. In the second paragraph the deeds reserve

and the further right of my mining and transporting the coal of and from other lands through and by means of the openings, ways and structures upon and in the said lands as well as over Same; also the right to take and use so much water from said land as said mining purposes may require."

The Red Jacket deed reserves:

"(1) All estates in said lots except the surface, including in the estates hereby excepted and reserved, but not limited to, all the coal, gases, salt water, oil, ores, and minerals of every description in, upon and under said lots, together with full and complete rights and privileges of every kind for prospecting for, mining, boring for and removing the same, and with the perpetual right and easement to construct, maintain and use underground haulways, pipe lines, conduits and passages through and under said lots for transporting and hauling coal, gases, salt water, oil, ores and minerals and other products of lands, materials, equipment, supplies and persons by the said party of the first part, its lessees, licensees, successors and assigns, from said lots, as well as from any lands whatsoever, and without liability for loss or damage to the surface of said lots or to any buildings or structures at any time placed thereon, or for the diversion of any surface or subterranean water course or courses in any way or manner caused by or resulting from the use, exercise, operation and enjoyment of the estates hereby excepted and reserved.

*    *    *    *    *

"(4) It is understood that coal mining operations will be conducted by the party of the first part, its lessees, licensees, successors or assigns, in the vicinity of the said Oakwood Subdivision and of the lots hereby conveyed. Said party of the first part therefore excepts and reserves unto itself, its successors, lessees, licensees and assigns, the right and privilege of conducting mining operations and incidental activities in the vicinity of the said Oakwood Subdivision and the lots hereby conveyed; and the said party of the second part for herself and her successors in title as to the surface of said lots hereby waives and relinquishes all claims or demands for damages which she or her successors in title as to said surface may now or hereafter have by reason of any such coal mining operations and incidental activities, including, but not restricted to, all claims or demands for damages arising from noise, vibration, the pollution or diversion or obstruction of streams, the pollution of air, or the emission of dust, smoke, fumes or noxious gases.

"The above reservations, exceptions, easements, waivers and covenants shall be deemed to be covenants running with the surface of said lots, and shall be binding upon the said party of the second part and her successors in title as to the surface of said lots, and shall inure to the benefit of the said party of the first part, its lessees, licensees, successors and assigns."

easements for utilities for servicing the subdivisions. In the third paragraph they reserve easements for streets, roads and alleys in the subdivisions. The fourth paragraph, dealing with the company's right to conduct mining operations in the vicinity of the subdivisions without liability for air pollution and dust provides:

> "It is understood that coal mining operations will be conducted * * * in the vicinity of the said Oakwood Subdivision [5] and of the lots hereby conveyed. [The company] excepts and reserves * * * the right and privilege of conducting mining operations and incidental activities in the vicinity of the said Oakwood Subdivision and the lots hereby conveyed; and [the grantee] hereby waives and relinquishes all claims or demands for damages which [the grantee] may now or hereafter have by reason of any such coal mining operations and incidental activities, including, but not restricted to, all claims or demands for damages arising from noise, vibration, the pollution or diversion or obstruction of streams, the pollution of air, or the emission of dust, smoke, fumes or noxious gases."

The deeds next provide that the conveyance of the surface is subject to certain agreements, covenants and restrictions running with the land for a period of ten years, expiring in 1963, to "provide a uniform plan for the improvement" of the subdivision. The lots are restricted to residential, business and community purposes only. They cannot be subdivided into smaller lots and only a single dwelling house is permitted on the residential lots. The restrictive covenants also provide "no business, operation, or undertaking of an offensive or dangerous nature shall be permitted * * *."

### III.

In Virginia, as the Supreme Court of Appeals has frequently admonished, the intent of the parties governs the construction of deeds, and to ascertain their intent a court must consider the entire instrument and not merely isolated clauses. Clyborne v. McNeil, 201 Va. 765, 113 S.E.2d 672, 676 (1960). In Stonegap Colliery Co. v. Hamilton, 119 Va. 271, 89 S.E. 305 (1916), perhaps the leading Virginia case on the construction of mineral deeds, the Court held that one owning rights to mine coal cannot deprive the surface of support unless the right to do so has been reserved by clear and unequivocal language. The Court reasoned that when mineral rights are severed from surface rights, the owner of the mineral rights contemplates that the surface is to be used and he assents to its use. "Unquestionably, the dominant intent of the deed," the Court wrote, "and the purpose for which it was executed is that the grantee shall have the surface, with the right to its use and enjoyment *modo et forma*, while the grantor still owned the coal, with the right to mine and market it; but, in the enjoyment of their respective rights, each was to regard the right of the other, as the maxim of the law *'sic utere tuo ut alienum non laedas'* applies." 89 S.E. at 311. Although factually dissimilar, *Stonegap* expresses two principles applicable to the controversy before us. The holder of mineral rights may injure the surface only so much as its deed allows. And, when surface and mineral rights are severed, the parties contemplate that mining operations will not needlessly render the surface useless.

Following *Stonegap*, the Court decided Yukon Pocahontas Coal Co. v. Ratliffe, 181 Va. 195, 24 S.E.2d 559 (1943), a case of particular interest to us because it construed the Buchanan Coal & Coke deed from which both Beatrice Pocahontas and some of the property owners in this case trace their title. There the coal company had been granted, in addition to the mineral rights, sufficient land to erect certain specified structures

---

5. The deeds to lots in the Keen Mountain subdivision refer to that subdivision instead of Oakwood.

and other devices necessary for the mining and manufacturing of coal. The company sought to enjoin the owners of the surface from subdividing it into lots and from platting streets and alleys. It contended the landowners' plans would deprive it of the right to erect stores, warehouses, supply houses, miners' homes, hospitals, gardens, pastures and rights-of-way in contravention of its grant. The Court rejected the company's broad construction of the deed and denied the injunction. Formulating a rule pertinent to the case before us, the Court said that the necessity for the erection of the structures on the surface "is a question of fact to be determined from the evidence in each particular case." 24 S.E. 2d at 564.

Finally, in Oakwood Smokeless Coal Corp. v. Meadows, 184 Va. 168, 34 S.E. 2d 392 (1945), where adjacent tracts had a common source of title, the Court held that even though drainage rights were not mentioned in a mineral deed, the owner of the mineral rights in one tract was not liable for polluting a spring on the adjacent tract with water from the mine. Recognizing that discharge of water was essential to operation of the mine, the Court construed the deed as implicitly granting drainage rights. But the Court emphasized that the rights implicitly granted were only those necessary for the enjoyment of the right to mine.

In *Stonegap, Yukon,* and *Oakwood,* the right to mine was severed from the right to use the surface. In contrast, Smith v. Pittston Company, 203 Va. 711, 127 S.E.2d 79 (1962), involved a claim for damages for air pollution against a coal processing company by a landowner whose property was not subject in any way to the company's title. Since the company could not claim any contractual right to invade the surface, the Court held that it would be liable if it created a private nuisance, regardless of the degree of care or skill it exercised to avoid injury to the neighboring property. When the neighboring property is not subject to mining rights, the Court expressly held, the only issue is whether or not the operation of a coal processing plant "caused substantial damage to the plaintiff, regardless of the location of the plant and the nature and importance of its operation." 127 S.E.2d at 84.

## IV.

■■ Under the *Oakwood* rationale, Pocahontas cannot be held liable for dust which is reasonably necessary for the preparation of coal in the ordinary way even though the right to deposit dust on the surface is not mentioned in the Boyd, Vandikes, or Buchanan deeds. But equally important, that case also teaches that the surface cannot be burdened by dust that is not the product of ordinary operations or by dust which the coal operator reasonably can control. Furthermore, the coal company is not the sole arbiter of the amount of dust it can deposit on the surface. Under *Yukon*, the necessity of invading the surface is an issue of fact to be determined from the evidence.

■ Nor can we construe the Red Jacket deeds as allowing Pocahontas to deposit on the surface more dust than is normal in the ordinary processing of coal. The deeds show on their face that the company intended people to live and work in the subdivisions it created. When all provisions of the Red Jacket deeds are considered as a whole, it is plain that the parties never contemplated that the grantor through the emission of needless dust could seriously impair the rights it had granted the owners of the surface. Cf. Stonegap Colliery Co. v. Hamilton, 119 Va. 271, 89 S.E. 305, 311 (1916). This is not to say, however, that the waiver of damages for air pollution and the incidental rights reserved by the company perform no function. They insulate the company from the liability that otherwise would be imposed by Smith v. Pittston Company, 203 Va. 71, 127 S.E.2d 79 (1962).

■ We conclude, therefore, that Pocahontas can emit only that amount of coal dust reasonably necessary to produce marketable coal. It cannot impose

**320**

on these property owners the cost of its pollution if means of collecting the dust are reasonably available. Accordingly, the case presents at least these genuine issues of fact: (1) the amount of dust the plant emits; (2) the effect of this dust on the appellants' health and property; and (3) whether the emission of the dust is reasonably necessary for the production of coal in the ordinary manner, or whether it has been caused by improper operating procedures or ineffective equipment.[6] Summary judgment, therefore, was not appropriate.

The judgment of the district court is reversed, and this case is remanded for further proceedings consistent with this opinion.

---

6. The third issue applies only to the appellants. The other plaintiffs, whose claims were not dismissed, stand on a different footing. Cf. Smith v. Pittston Company, 203 Va. 71, 127 S.E.2d 79 (1962).