ROBERT LEE MERRITT AND WINNIE MERRITT, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 84122–84126, 90765, 90766.  Filed October 31, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith: G. Wesley Merritt and Fannie J. Merritt, Docket No. 84123; Jack D. Merritt and Willa Gray Merritt, Docket No. 84124; Virgil Bowling and Gladys Bowling, Docket No. 84125; James O. Watson 3d and Lucy J. Watson, Docket No. 84126; C. A. Clyborne and Vernice H. Clyborne, Docket No. 90765; and Paragon Jewel Coal Company, Incorporated, Docket No. 90766.

*John Y. Merrell, Esq.*, for the petitioners in Docket Nos. 84122, 84123, 84124, 84125, and 84126.

*LeRoy Katz, Esq., Carl C. Gillespie, Esq.*, and *Frederick Bernays Wiener, Esq.*, for the petitioners in Docket Nos. 90765 and 90766.

*Bart A. Brown, Jr., Esq.*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent originally determined deficiencies in income tax and additions thereto due from petitioners as follows:

| Docket No. | Petitioner | Year | Deficiencies | | |
|---|---|---|---|---|---|
| | | | Income tax | Additions to tax, I.R.C. 1939, secs. | |
| | | | | 294(d)(1)(A) | 294(d)(2) |
| 84122 | Robert Lee Merritt and Winnie Merritt | 1954 | $848.48 | $208.50 | $135.24 |
| | | 1955 | 1,532.21 | | |
| | | 1956 | 3,373.52 | | |
| 84123 | G. Wesley Merritt and Fannie J. Merritt | 1954 | 886.88 | 231.58 | 125.18 |
| | | 1955 | 1,596.52 | | |
| | | 1956 | 3,317.39 | | |
| 84124 | Jack D. Merritt and Willa Gray Merritt | 1956 | 3,531.81 | | |
| 84125 | Virgil Bowling and Gladys Bowling | 1955 | 90.18 | | |
| | | 1956 | 3,342.48 | | |
| 84126 | James O. Watson 3d and Lucy J. Watson | 1954 | 876.83 | | |
| | | 1955 | 1,975.05 | | |
| 90765 | C. A. Clyborne and Vernice H. Clyborne | 1955 | 16,907.02 | | |
| | | 1956 | 23,449.76 | | |
| | | 1957 | 27,551.33 | | |
| | | *Taxable year ended Sept. 30—* | | | |
| 90766 | Paragon Jewel Coal Company, Incorporated. | 1955 | 2,529.29 | | |
| | | 1956 | 36,588.04 | | |
| | | 1957 | 57,021.20 | | |

In addition, by amendment to answer [2] respondent has asserted claims for increased deficiencies, over and above those set forth above, in income tax as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 90765 | C. A. Clyborne and Vernice H. Clyborne | 1955 | $8,356.13 |
| | | 1956 | 6,936.34 |
| | | 1957 | 9,015.27 |
| | | *Taxable year ended Sept. 30—* | |
| 90766 | Paragon Jewel Coal Company, Incorporated | 1955 | 5,434.51 |
| | | 1956 | 5,711.56 |
| | | 1957 | 6,481.32 |

Petitioner in Docket No. 90766 has made claim for overpayment for the taxable year ended September 30, 1955, in the amount of $6,307.24.

The issues remaining for decision in Docket No. 90766 are:

(1) Whether Paragon Jewel Coal Company, Incorporated (hereafter called Paragon), is entitled to deduct as royalties in each of its taxable years here involved, amounts paid to C. A. Clyborne (hereafter called Clyborne), or whether such amounts constituted non-deductible distributions of earnings and profits of Paragon.

(a) The correlative issue of whether such amounts are taxable to Clyborne as royalties, as reported by Clyborne, or as dividends as claimed by respondent, is the only remaining issue in Docket No. 90765.

(2) Whether Paragon is entitled to the deduction for percentage depletion with respect to its entire gross income from coal mined under contract by Standard Smokeless Coal Company, Kyva Mining Company, Farwest Coal Company, Bare Ridge Coal Company, Sally Mining Company, and Meadows Coal Company (hereafter called, respectively, Standard, Kyva, Farwest, Bare Ridge, Sally, and Meadows, or referred to individually or collectively as contractor or contractors), less royalties paid; or whether Paragon's "gross income from mining," for purposes of computing the deduction for percentage depletion is to be reduced by the amounts paid these contractors.

(a) The correlative issue of whether certain of the contractors, Standard, Kyva, and Farwest, are entitled to deductions for percentage depletion with respect to amounts paid them by Paragon is the only remaining issue in Docket Nos. 84122, 84123, 84124, 84125, and 84126, the male petitioners in those docket numbers having been partners in one or more of those firms. The other contractors mentioned above are not parties in this proceeding.

---

[2] Although respondent in Docket Nos. 90765 and 90766 filed second amendments to answers, no increased deficiencies were therein asserted.

For convenience the two principal issues will be referred to, respectively, as the "royalty issue" and the "depletion issue." Petitioners in Docket Nos. 84122–84126 are not involved in the royalty issue and respondent has taken a neutral position with respect to the depletion issue, agreeing at the trial that either Paragon or the contractors are entitled to depletion on the amounts paid by Paragon to the contractors, but not both.

### GENERAL FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioners in Docket No. 84122 are Robert Lee Merritt (hereafter called Lee) and Winnie Merritt, husband and wife, who resided in Grundy, Virginia, during the period here involved, and who filed joint Federal income tax returns for the calendar years 1954, 1955, and 1956 with the district director of internal revenue, Richmond, Virginia.

Petitioners in Docket No. 84123 are G. Wesley Merritt (hereafter called Wesley) and Fannie J. Merritt, husband and wife, who resided in Louisa, Kentucky, during the period here involved, and who filed joint Federal income tax returns for the calendar years 1954, 1955, and 1956 with the district director of internal revenue, Louisville, Kentucky.

Petitioners in Docket No. 84124 are Jack D. Merritt (hereafter called Jack) and Willa G. Merritt, husband and wife, who resided in Grundy, Virginia, during the period here involved, and who filed a joint Federal income tax return for the calendar year 1956 with the district director of internal revenue, Richmond, Virginia.

Petitioners in Docket No. 84125 are Virgil Bowling (hereafter called Bowling) and Gladys Bowling, husband and wife, who resided in Grundy, Virginia, during the period here involved, and who filed joint Federal income tax returns for the calendar years 1955 and 1956 with the district director of internal revenue, Richmond, Virginia.

Petitioners in Docket No. 84126 are James O. Watson 3d (hereafter called Watson) and Lucy J. Watson, husband and wife, who resided in Louisa, Kentucky, during the period here involved, and who filed joint Federal income tax returns for the calendar years 1954 and 1955 with the district director of internal revenue, Louisville, Kentucky.

Petitioners in Docket No. 90765 are C. A. Clyborne and Vernice H. Clyborne, husband and wife, who resided in Bluefield, West Virginia, during the period here involved, and who filed joint Federal income tax returns for the calendar years 1955, 1956, and 1957 with the district director of internal revenue, Parkersburg, West Virginia.

Petitioner in Docket No. 90766 is Paragon Jewel Coal Company, Incorporated, a corporation organized under the laws of Virginia on October 22, 1951, and having its principal business office in Bluefield, West Virginia. It filed a Federal income tax return and an amended return for the taxable year ended September 30, 1955, and Federal income tax returns for the taxable years ended September 30, 1956 and 1957, with the district director of internal revenue, Richmond, Virginia.

## I. *Royalty Issue.*

### FINDINGS OF FACT.

Clyborne moved to Bluefield, West Virginia, in 1918 as district manager for a corporation engaged in the business of acting as sales agent for coal and coke companies. He worked for the same employer, or for employers engaged in the same business, until 1929 when the corporation for which he was working discontinued business. During this period his experience in coal production was limited to acting as manager of a small operation in Virginia. In the 1930's he entered into a coal sales contract with a sales company in Baltimore, Maryland, which was also a wholesaler of coal and coke. He organized a corporation, Clyborne, Incorporated, to act as agent for the sales company, which it still does. In this work Clyborne became familiar with the coal fields of southern West Virginia and of southwestern Virginia.

In about 1944 or 1945, J. H. Franks (hereafter called Franks), who had been in the coal-mining business in Russell, Tazewell, and Buchanan Counties in Virginia for a number of years, approached Clyborne for financial assistance in "blocking up leases" of coal properties in the Whitewood or Dismal River section of Buchanan County, Virginia. In order to justify the necessary investment for a substantial mining operation it is necessary to obtain leasehold interests, or some interest in the coal in place, in a large area of land. This often entails obtaining mining leases, or title to the minerals, from the owners of several (or, perhaps many) contiguous tracts of land containing the seam which is to be mined. Also involved is the acquisition of rights to bring mined coal over or through land which lies between the point of a proposed mining operation and the point where the mined coal is to be processed and loaded. This practice of obtaining leaseholds or title to the minerals and wheelage rights is called "blocking up leases" and might be done by an individual on his own behalf or as an agent for an operating company. It is a practice which has been prevalent in Buchanan County for a number of years and in the Whitewood area since a railroad was built along Dismal River in the 1930's.

Franks had acquired options to lease the minerals underlying a part of the Cole heirs' tract on Laurel Fork of Dismal River above Whitewood. Clyborne was generally familiar with the seams of coal underlying that area and was particularly interested in the Raven, or Jewell, seam [3] which was known to be found in the area. The Jewell seam produces a relatively low volatile bituminous coal which has low sulphur and low ash content and good coking structure, and hence is suitable for the high-priced metallurgical coal market. However, the Jewell seam in this area was unpredictable, containing numerous faults and pinching out entirely in places, and was quite thin, ranging on the average between 24 and 32 inches. Prior to 1950 the only major coal operator in the area was Jewell Ridge Coal Corporation, which had acquired the mineral rights on a large part of the coal lands in the general area. Also, prior to World War II, equipment had not been available to mine such a thin seam of coal at a profit. But with the advent of the railroad up Dismal River, improved mining equipment, and the demand for metallurgical grade coal, Clyborne felt that coal from the Jewell seam in the Whitewood area might be mined and sold at a profit. Consequently, he entered into an arrangement with Franks whereby Clyborne would put up the necessary capital to acquire the leases, which would be taken in the names of Franks and Clyborne, and Franks' one-half share of the capital investment would be repaid to Clyborne out of Franks' share of royalties received from the coal.

This relationship, with variations and minor exceptions, continued until about 1952 when Clyborne began acquiring leases directly in his own name. As hereinafter detailed in our findings of fact on the depletion issue, Clyborne, d.b.a. Paragon Jewel Coal Company, began construction of a coal tipple and cleaning plant on the McNeil tract in January 1951 which was completed on or after October 22, 1951. On October 22, 1951, Clyborne formed Paragon Jewel Coal Company, Incorporated, for the purpose of mining, through independent contractors, processing, and selling the coal mined from the leases referred to above, and transferred the tipple and cleaning plant to the corporation. Clyborne and his wife were the sole stockholders of the corporation when it was formed and Clyborne continued to be the principal and controlling stockholder, and principal officer, of the corporation throughout the years here involved.

After the corporation was formed Clyborne from time to time assigned leases held in his name to Paragon for a royalty of 30 cents per ton. The corporation assumed responsibility for Clyborne's

---

[3] Testimony indicates that "Raven" or "Raven Red Ash" are the names for the seam used generally. "Jewell" is the name used locally. Sometimes the name "Jewell Ridge" is used. See findings with reference to the Brown heirs' No. 2 tract.

liabilities under these leases, but in most instances the landowners were not parties to the assignment and Clyborne remained liable to them for minimum royalties, etc., under the original leases. With respect to the leases acquired in the joint names of Clyborne and Franks (and in one instance W. M. Culbertson, Jr., hereafter called Culbertson), Clyborne first acquired by assignment the outstanding interest in the leases in his own name, agreeing to assume the obligations of the assignors under the leases and pay them an overriding royalty on coal produced thereunder, usually being 2½ cents per ton, and then assigned the entire interest in the leases to Paragon. Paragon paid Clyborne the 30-cent royalty for which it was obligated, and Clyborne then paid the basic and overriding royalties to the landowners and others, retaining the balance himself. The basic royalties ranged from 10 cents to 20 cents per ton. The overriding royalties to Franks or Culbertson were usually 2½ cents per ton. Clyborne retained 10 cents to 15 cents of the royalty paid by Paragon.

The details of these transactions which are pertinent here are set out below. Generally speaking, respondent has recognized as an overriding royalty paid to Clyborne an amount equal to the overriding royalty paid to Franks or others. All of the Paragon royalty not paid out or so recognized as basic or overriding royalty was determined to be a dividend from Paragon to Clyborne.

The various properties in which Clyborne acquired an interest and later transferred to Paragon, which are pertinent here, are:

*Cole Heirs' Tract.*[4]—The first properties in which Clyborne acquired interests were owned by the Cole heirs. By a series of 10 instruments dated August 1, 1945, to September 13, 1947, which were generally executed after Franks had negotiated and obtained the landowners' verbal commitment or option, the Cole heirs conveyed title to all the coal and other minerals underlying some 531.1 acres of surface and title in fee simple to some 228.5 acres of land to Franks and Clyborne for a total consideration of $24,862.50.[5]

On August 24, 1948, Clyborne, joined by his wife, executed a deed by which he conveyed his undivided one-half interests in the Cole heirs' tract to Clyborne, Incorporated, for a consideration of $65,000. Clyborne specifically reserved the Cary seam from the interests thus conveyed. The Cary seam lies above the Jewell seam and produces a steam coal.

[4] By this and other such references, we make no findings with respect to the status of any interest in any parcel or parcels of land for purposes of section 614 of the 1954 Code.

[5] The parties disagree on brief as to the exact acreage involved in the conveyances, copies of which have been stipulated, and there appears to be a difference of $50 as to the consideration paid for the minerals. Our summary is the most accurate which we can glean from the entire record. The differences appear to be due to questions as to whether a 6.1-acre tract had been included in a prior conveyance, and whether small areas excepted in some deeds for interests in minerals related to grants of easements or to grants of coal.

By "deed of lease" dated October 22, 1951, Franks, joined by his wife, and Clyborne, Incorporated, leased to Clyborne the exclusive right to mine, "by the deep mining method," the coal from the Jewell seam in the Cole heirs' tract, for a royalty of 20 cents per ton, with a minimum royalty of $2,000 per year beginning on January 2, 1955. One-half of the royalties were to be paid to Franks; one-half to Clyborne, Incorporated. The lease was for a 3-year period from January 2, 1954, with automatic renewal for 3-year periods until all of the minable and merchantable coal in the Jewell seam (based on an 85-percent recovery) was mined and removed.

By "deed of assignment" dated October 22, 1951, Clyborne, joined by his wife, assigned his interests under the foregoing lease to Paragon in consideration of Paragon's assumption of Clyborne's obligations under the lease and the payment of a royalty of 30 cents per ton of coal mined under the lease, which royalty was to be distributed as follows:

|  | Cents |
| --- | --- |
| Franks | 10 |
| Clyborne, Incorporated | 10 |
| Clyborne | 10 |

*Dennis Tract.*—On May 1, 1946, W. Clyde Dennis, joined by his wife, leased to Clyborne and Franks all the coal underlying a 114-acre tract [6] for 10 years, with the privilege on the part of the lessees to renew the lease for additional 10-year periods. The royalty was to be 10 cents per ton for all coal mined by the "tunnel or drift mouth mining method" and 20 cents per ton strip mined. Minimum royalty was to be $100 per year. Assignment of the lessees' interests was to be only with Dennis' consent, and the lessees were to remain personally liable under the lease in the event of subletting or assigning. The lessees were to purchase from Dennis, who was in the insurance business, all the insurance coverage involved in the mining operations.

By deed of assignment dated June 3, 1953, Franks, joined by his wife, assigned his interest in the Dennis lease to Clyborne in consideration of Clyborne's assumption of his obligation and of Clyborne's payment to him of a royalty of 5 cents per ton of coal mined under the lease. On the same date, Clyborne assigned his interests in the lease to Paragon, which assumed Clyborne's obligations. Paragon was to pay a royalty of 30 cents per ton to be distributed as follows:

|  | Cents |
| --- | --- |
| Dennis | 10 |
| Franks | 5 |
| Clyborne | 15 |

---

[6] The tract described in the lease consisted of about 116 acres, of which Dennis apparently owned 114 acres in fee and 2 acres of surface only. This was originally a part of the Cole property.

Because of dissatisfaction with the provision for the purchase of insurance from Dennis, in a supplemental lease dated May 1, 1956, the provision was omitted and the royalty payable to Dennis was increased to 15 cents. Franks assigned his interest in this supplemental lease to Clyborne in consideration of a royalty of 2½ cents per ton, and on June 15, 1956, Clyborne assigned his interest to Paragon by a deed of assignment which provided for a 30-cent-per-ton royalty to be paid by Paragon and distributed as follows:

|  | Cents |
|---|---|
| Dennis | 15 |
| Franks | 2½ |
| Clyborne | 12½ |

*McNeil Tract.*—By deed of lease dated August 1, 1946, a group of related landowners known as the McNeil heirs leased to Clyborne, Franks, and Culbertson all the coal underlying a 750-acre (approximately) tract. Royalty was 15 cents per ton, with a minimum royalty of $1,000 per year for the first 2 years and $4,000 per year thereafter. The lease provided for a wheelage charge of 2½ cents per ton to be paid to the lessors. It was superseded by a lease dated August 1, 1948, providing for royalty of 15 cents, minimum annual royalty of $4,000, and wheelage of 2½ cents per ton.

On January 12, 1951, Culbertson and Franks assigned their interests in the McNeil lease to Clyborne in consideration of the payment to each of them of a royalty of 2½ cents per ton, plus $2,500.[7]

Clyborne, on October 22, 1951, assigned his interests under the McNeil lease to Paragon, which agreed to assume his obligations under the lease and to pay a royalty of 30 cents per ton, to be distributed as follows:

|  | Cents |
|---|---|
| Landowners | 15 |
| Franks | 2½ |
| Culbertson | 2½ |
| Clyborne | 10 |

Clyborne was subsequently engaged in litigation with the lessors with respect to the provision for wheelage. He was the losing party in the litigation and was required to pay approximately $85,000 to the lessors, plus amounts in the future. See *Clyborne* v. *McNeil*, 201 Va. 765, 113 S.E. 2d 672 (1960).

*Mary Day Tract.*—On March 1, 1951, Mary A. Day, joined by her husband, executed a deed conveying to Franks and Clyborne title to all the coal underlying a 67.5-acre tract, for a stated consideration of $1,345 plus land valued at $1,000.[8]

---

[7] This amount represented minimum royalties theretofore paid by Franks and Culbertson and was to be reduced by any amounts which it was determined they owed Clyborne. The amount of $2,500 was to be paid to each of Franks and Culbertson.

[8] This was also originally a part of the Cole property.

On January 2, 1952, Franks leased his one-half undivided interests in the coal in the Jewell seam in this property to Clyborne for a royalty of 10 cents per ton, with a minimum annual royalty of $325 until 85 percent of the merchantable and minable coal from the Jewell seam was mined. On the same date, Clyborne assigned this lease of an undivided one-half of the Jewell seam on the Mary Day tract to Paragon for a royalty of 20 cents per ton, of which 10 cents was to be paid to Franks and 10 cents to Clyborne.

Also on January 2, 1952, Clyborne leased his own undivided one-half interest in the Jewell seam to Paragon for a royalty of 10 cents per ton, with minimum royalty of $325 per year until 85 percent of the merchantable and minable coal was removed.

*Brown Heirs' Tract No. 1.*—By lease dated April 28, 1952, a group of related landowners, known as the Brown heirs, leased to Clyborne the coal in the Jewell and Cary seams underlying some 889 acres. The royalty was 15 cents per ton of coal deep mined from the Jewell or Cary seams and 25 cents per ton of coal strip mined from the Cary seam, with a minimum annual royalty of $4,000 payable until 85 percent of the merchantable and minable coal was removed.

On October 28, 1952, Clyborne assigned to Paragon his interests under the Brown heirs lease (covering tract No. 1) for a royalty of 30 cents per ton, of which 15 cents was to be paid the lessors and 15 cents was to be retained by Clyborne.[9]

*Tazewell Coal & Iron Company Tract.*—On July 1, 1950, Tazewell Coal & Iron Company leased to John J. Jewell all the coal in the Jewell seam underlying an estimated 200-acre tract, for a 5-year term. The royalty payable to the lessor was 20 cents per ton, except that for any month when the average gross selling price of coal at the mine was $5.50 per ton, or over, the royalty was to be 25 cents per ton. Minimum annual royalty was $1,000. The lease was for a term of 5 years, but on August 1, 1952, the term was extended to 10 years from July 1, 1950.[10]

By deed of assignment dated November 12, 1953, Jewell assigned his interests under the Tazewell Coal & Iron Company lease to Clyborne for a consideration of $2,250. This amount was to be adjusted for the amount of merchantable and minable coal underlying the tract: If such coal in the Jewell seam exceeded 450 acres, Clyborne was to pay the assignor at the rate of $5 per acre for such excess; if such coal was less than 450 acres, the assignor was to refund to Clyborne at the rate of $5 per acre for such deficiency. In this assignment it was specifically provided that Clyborne, in turn, could assign his

---

[9] No specific provision was made for payment of 25-cent-per-ton royalty to the Brown heirs in the event Paragon strip mined the Cary seam.

[10] The provisions of a second amendment of November 11, 1953, are not shown by the evidence.

interests to Paragon, in which event, upon Paragon's assumption of his obligations, Clyborne was to be discharged.

On December 7, 1953, Clyborne and the Tazewell Coal & Iron Company entered into an agreement by which the latter consented to the assignment of Jewell's interests to Clyborne and agreed that Clyborne could assign his interests to Paragon if Paragon assumed the obligations of the lessee, in which event Clyborne was to be fully discharged under the lease.

Also on December 7, 1953, Clyborne assigned his interests to Paragon for a royalty of 30 cents per ton, of which, 20 cents was to be paid Tazewell Coal & Iron Company, and 10 cents was to be retained by Clyborne.[11]

*Metcalf Tract.*—On July 9, 1953, Carl F. Metcalf (hereafter called Metcalf) leased to Franks for 10 years all the coal above and in the Allen Spring seam underlying a 136-acre tract. Metcalf was Franks' son-in-law. Royalty was 15 cents per ton.[12]

By instrument dated August 2, 1953, Franks assigned to Clyborne his interests in the Metcalf seam in return for a royalty of 2½ cents per ton payable to Franks. Also on August 2, 1953, Clyborne assigned his interests to Paragon, which was to pay a royalty of 30 cents per ton, of which 15 cents was to be paid to Metcalf, 2½ cents to Franks, and 12½ cents was to be retained by Clyborne.

*Hinton Heirs' Tract.*[13]—On September 1, 1953, Etta Hankins and other Hinton heirs leased to Clyborne all the merchantable and minable coal in the Jewell seam underlying some 1,173 acres. The lease provided for a royalty of 15 cents per ton with a minimum annual royalty of $4,000 until 85 percent of the coal was removed. The lessee had the right to transport at no cost, over and through the leased property, coal mined from the property, but was to pay wheelage of 2 cents per ton for transportation of other coal. The Hinton heirs had previously leased to Clyborne and Franks the Cary seam on the property, and they had leased the Jawbone seam to Franks and Culbertson. In the event of assignment, Clyborne was to be personally liable under the lease.

By deed of assignment dated January 30, 1956, Clyborne assigned his interests in this lease to Paragon. This assignment provided for a royalty of 30 cents per ton, of which 15 cents was to be paid to the lessors, and 15 cents was to be retained by Clyborne as consideration for the assignment.

---

[11] No specific provision was included for payment of the 25-cent royalty to Tazewell Coal & Iron Company if the gross selling price of the coal mined reached $5.50.

[12] This was also originally a part of the Cole property.

[13] This tract was also referred to as the Hankins tract in the record.

*Brown Heirs' Tract No. 2.*—By deed of lease dated December 1, 1954, the Brown heirs leased to Clyborne all the merchantable and minable coal in the Jewell (called "Jewell Ridge" seam in the lease) seam and in the Cary seam underlying a 573.8-acre tract for a royalty of 15 cents per ton for coal deep mined from either seam or auger mined from the Cary seam, and a royalty of 25 cents per ton of coal strip mined from the Cary seam. Minimum annual royalty was $2,500 until 85 percent of the merchantable and minable coal was mined. Clyborne was given the right to transport any coal mined from the tract over and through the property without charge. Also, Clyborne could transport, free of charge, over and through the Brown heirs' tract No. 1, any coal mined from the property. But Clyborne had to pay a wheelage charge of 2 cents per ton for any other coal transported over or through the property. Clyborne could assign his interests under the lease, but he was not to be thereby relieved from his obligations under it.

On December 2, 1954, Clyborne assigned his interests under this lease to Paragon, to the extent that the latter was given the right to deep mine the Jewell (or, as it was termed in the assignment, the Jewell Ridge) seam in consideration of a royalty of 30 cents, of which 15 cents was to be paid to the lessors and 15 cents was to be retained by Clyborne.

Clyborne also purchased either the minerals or the fee in two other tracts from the Brown heirs.

A summary of the royalties paid by Paragon with respect to the leases here involved to Clyborne and others and the amount paid to Clyborne and disallowed as royalties by respondent is as follows:

| Tract | Total royalty per ton paid by Paragon | Paid to others | Paid to Clyborne | Disallowed by respondent |
|---|---|---|---|---|
| McNeil | $0.30 | $0.20 | $0.10 | $0.05 |
| Cole heirs | .30 | .20 | .10 | .10 |
| Mary Day (Franks—½) | .20 | .10 | .10 | .10 |
| Mary Day (Clyborne—½) | .10 | | .10 | |
| Brown heirs No. 1 | .30 | .15 | .15 | .15 |
| Dennis (first lease) | .30 | .15 | .15 | .10 |
| Dennis (second lease) | .30 | .175 | .125 | .10 |
| Metcalf | .30 | .175 | .125 | .125 |
| Tazewell Coal & Iron Co | .30 | .20 | .10 | .10 |
| Brown heirs No. 2 | .30 | .15 | .15 | .15 |
| Hinton heirs | .30 | .15 | .15 | .15 |

Jewell Smokeless Coal Corporation, which has been operating in the Buchanan County area since 1951, and some of whose properties adjoin those of Paragon, made leases of the Jewell seam as follows:

1952—tonnage royalties—20 cents.
1955—tonnage royalties from 15 to 20 cents.
1956—tonnage royalties—25 cents.
1959—tonnage royalties—25 cents.

Jewell Smokeless has also taken leases in this area under which it has paid an overriding royalty of 10 cents or more per ton.

Jewell Ridge Coal Corporation, which has been mining in the same general area since about 1910, entered into leases of the Jewell seam in Buchanan County, Virginia, and McDowell County, West Virginia, during the period 1950 to 1955, calling for tonnage royalties of 15 cents and 16 cents, with higher royalty provisions for the better grades of coal and if Jewell Ridge mined the coal from the surface.

A royalty of 25 cents per ton was reasonable for Paragon to pay during the years here involved. Royalties paid by Paragon to Clyborne in excess of 25 cents per ton were distributions of Paragon's earnings and profits to Clyborne.

OPINION.

Paragon claimed deductions for amounts paid Clyborne, its principal stockholder, as coal royalties. Clyborne reported the amounts he received from Paragon in excess of royalties he paid others as overriding royalties taxable as capital gains under section 631 of the 1954 Code.[14] Respondent disallowed all or a part of the overriding royalties retained by Clyborne as deductions to Paragon and denied Clyborne the benefit of capital gains treatment thereon. Essentially, it is respondent's position that the amounts in controversy paid Clyborne by Paragon constitute dividends to Clyborne, taxable as ordinary income, and are nondeductible by Paragon.

Respondent does not attack the existence of Paragon as a separate taxable entity, but he does claim (1) that Clyborne had no assignable interest in the leaseholds for which Paragon could be required to pay an overriding royalty, (2) that the payments of overriding royalties by Paragon to Clyborne were both unrealistic and unreasonable in amount, designed solely for the purpose of obtaining a tax advantage by providing a deduction for Paragon of an amount which would be taxable as capital gains to its principal stockholder, and (3) that the amounts paid were not in fact royalties but were dividends.

A stockholder may deal with his controlled corporation and transactions entered into between them may be accorded recognition for tax purposes. *Sun Properties* v. *United States*, 220 F. 2d 171 (C.A. 5, 1955); *Differential Steel Car Co.*, 16 T.C. 413 (1951). Furthermore, taxpayers may arrange their affairs in such a manner as to minimize income tax. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). However, transactions between a stockholder and his controlled corporation warrant close scrutiny to determine that they are not mere artificialities, correct in form but lacking substance, contrived as a disguise for

---

[14] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

distribution of corporate earnings. *Ingle Coal Corporation* v. *Commissioner*, 174 F. 2d 569 (C.A. 7, 1949), affirming 10 T.C. 1199 (1948). The courts are not required to accept transactions between a stockholder and his controlled corporation, wherein the stockholder makes the decision for both sides, at face value for tax purposes. *Limericks, Inc.* v. *Commissioner*, 165 F. 2d 483 (C.A. 5, 1948), affirming 7 T.C. 1129 (1946). It is not enough that Paragon, by virtue of the assignments between itself and Clyborne, was formally obligated to pay royalties to Clyborne. *Ingle Coal Corporation* v. *United States*, 127 F. Supp. 573 (Ct. Cl. 1955). The payments are deductible as royalties by Paragon under section 162(a)(3) only to the extent that such payments are "required to be made as a condition to the continued use or possession * * * of property * * *." In determining whether payments made by a corporation to its controlling stockholder are *"required"* we think it is inescapable that the Court must inquire into the reasonableness of the amount paid, *Limericks, Inc.* v. *Commissioner, supra;* in other words, it becomes necessary to determine what the corporation would have been required to pay for the use of the property to an unrelated party dealing at arm's length under the same circumstances.

The question of the reality of the transactions between Paragon and Clyborne, as well as the reasonableness in amount of the royalties provided for therein, is a question of fact. A voluminous amount of evidence was offered by both parties on this issue and it would be impractical and would serve no useful purpose to elaborate on the details of this evidence. Suffice it to say that we have given careful consideration to all of the evidence in reaching our conclusions.

We find no basis for respondent's contention that Clyborne had no assignable interest in the leases for which Paragon could be required to pay an overriding royalty, which contention seems to be based on the premise that Clyborne was acting for Paragon in acquiring the leases. The evidence indicates that Clyborne entered into the activity of blocking up leases of coal properties in the Whitewood area in his individual capacity several years before the properties were opened up for mining and before the corporation was even organized. The Cole heirs' tract was acquired by Franks and Clyborne between 1945 and 1947, as was the Dennis tract. While the Mary Day tract was originally purchased in 1951 and the lease of the Metcalf tract was acquired in 1953, they were both parts of the original Cole property and served to round out property previously acquired. The original lease on the McNeil tract was acquired by Franks, Culbertson, and Clyborne between 1946 and 1948. Paragon was not incorporated and did not begin operation until 1951. We see no reason why Clyborne, having actively engaged in blocking up leases in his individual capacity be-

fore the corporation was formed, should not have continued this activity of acquiring subsequent leases in his own name even though he knew the properties would be operated by Paragon.

There is considerable evidence that some of the landowners in this area were not willing to grant a lease directly to a corporation but insisted on leasing to individuals on whose personal financial responsibility they could rely. The oral evidence on this point is supported by a provision contained in the Brown heirs No. 2 lease which specifically provided that Clyborne might assign the lease to Paragon but that he would be required to remain personally liable under the terms thereof. In some instances, Clyborne assigned to Paragon only the rights to mine the Jewell seam or other specific seams of coal while retaining for himself the right to mine other seams. There would also seem to be an adequate business reason for Clyborne to take the leases in his own name first and then assign them to Paragon. In the event Paragon failed, the leases would revert to Clyborne as long as he paid the minimum royalty rather than revert directly to the landowners.

For the above and other reasons we find that Clyborne was acting in his individual capacity in acquiring the leases in his own name and, consequently, that he had an assignable interest in the coal for which Paragon could be required to pay a royalty. Respondent's reliance on *Utter-McKinley Mortuaries* v. *Commissioner*, 225 F. 2d 870 (C.A. 9, 1955), affirming a Memorandum Opinion of this Court, is misplaced. It is distinguishable on the facts.

There can be little doubt from the evidence that Clyborne and Paragon intended the payments to Clyborne to be royalties. The written assignments specifically provide therefor, the books and records of both parties treated the payments as royalties, and there is no evidence from which to conclude that the parties intended them to be anything other than royalties.

The principal question seems to be whether the amounts paid by Paragon as royalties and the amounts received and retained by Clyborne as overriding royalties were fair and reasonable, when judged by standards of transactions entered into by parties dealing at arm's length. The parties agree that only the amount found to be deductible as royalties by Paragon should be treated as royalties received by Clyborne.

In the light of the evidence presented we could not definitely conclude that an unrelated corporation, under certain conditions, would not have agreed to pay Clyborne a royalty of 30 cents per ton for the coal mined from these properties. There was a good bit of oral testimony that a fair and reasonable royalty for Jewell seam coal with the chemical qualities of this coal would be between 30 cents and 40 cents per ton. However, there was no written evidence to support these assertions and they may have been colored somewhat by passage of

time. The period we are interested in is the period between 1951 and 1958, and the evidence indicates that the price of good metallurgical coal has been rising during and since that time. The written evidence presented tends to refute these oral assertions. As a matter of fact, judging from the evidence presented, both oral and written, it would appear that there was no precise figure that could be said to be a fair and reasonable royalty, or the going rate of royalty, on this coal in this area. It apparently was a question of bargaining on each lease, and the numerous variables in circumstances and personalities appear to have made the price equally as variable, within limits. However, using our best judgment based on all the evidence, we have concluded that an unrelated corporation in Paragon's position, whose officers had available all the information Clyborne had as an officer of Paragon, would not have been required to pay more than 25 cents per ton as royalty for the coal mined under the leases here involved.

The written evidence introduced in the form of leases held by Jewell Smokeless Coal Corporation and Jewell Ridge Coal Corporation, both being corporations operating in the Jewell seam in Buchanan County, indicates that those corporations were able to acquire the right to mine the Jewell seam in that area by paying royalties ranging from 15 cents per ton to 25 cents per ton. Clyborne himself was able to acquire some of the leases here involved for royalties ranging between 15 cents and 20 cents per ton.

We recognize that the practice of obtaining leases and assigning them to operating companies for an overriding royalty was prevalent in this area and that all of the operating companies knowingly paid overriding royalties on some of their leases. Consequently, we do not think it unreasonable that Clyborne should charge Paragon an overriding royalty for leases he assigned to it. With respect to the earlier leases, Clyborne and Franks went to considerable trouble and some expense in blocking up those leases. The evidence does not indicate how much time and effort Clyborne might have spent in obtaining the later leases which he took directly from the landowners in his own name. We do know that in the latter instances he assigned the leases within a relatively short time after he acquired them at an overriding royalty rate of 15 cents per ton. However, the date of execution of the leases does not indicate how much time might have been spent in working out the agreement. Also, Clyborne assumed liability for and remained personally liable for the minimum royalties under these leases, which totaled a considerable amount each year. We think these and other factors justify Clyborne in charging even his own corporation a reasonable overriding royalty.

We do not think the relationship between Clyborne and Paragon should cause us to deny that Clyborne may have been able to make bargain puchases of the leases which he should be entitled to pass on to

his controlled corporation at a profit to himself as long as the corporation was not required to pay more than a reasonable royalty under the circumstances.  Clyborne's good fortune should not control the question of whether the royalty paid by Paragon was reasonable and required.  Judging from the royalties paid by other companies operating in the area, Clyborne apparently was able to make some bargain purchases in acquiring these leases at a 15-cent royalty rate.  Furthermore, Paragon was able to earn a reasonable profit even after paying a 30-cent royalty.  However, we do believe that the overriding royalty charged by Clyborne was excessive for what he had to give to Paragon and also forced the total royalty paid by Paragon above the amount that would have been paid by an unrelated corporation dealing with Clyborne at arm's length under the same circumstances.

The preponderance of the evidence seems to indicate that a reasonable overriding royalty would not exceed 10 cents per ton and that the royalty Paragon could have expected to pay, dealing at arm's length under the circumstances here present, would have been 25 cents per ton.  Consequently, we conclude that 25 cents per ton of the amounts paid to Clyborne by Paragon represented royalties deductible by Paragon as ordinary and necessary business expenses under section 162(a)(3), and that the remaining 5 cents per ton paid by Paragon to Clyborne represented a nondeductible distribution of corporate earnings and profits and a dividend to Clyborne.

We realize that the overriding royalty allowed Clyborne as a result of the above conclusion would not be the same in all cases.  However, the basic question is what amount Paragon would have been required to pay as royalty dealing with a stranger at arm's length and we have considered the reasonableness of the overriding royalty received by Clyborne only as one of the factors in deciding the basic question.  Consequently, we have determined that the amount of royalty deductible by Paragon under all of the leases was 25 cents per ton, and that the amount taxable to Clyborne as royalties received is the difference between 25 cents per ton and the amounts required to be paid to the landowners and others as royalties and overriding royalties.  The remaining 5 cents per ton paid by Paragon under all the leases is not deductible by Paragon and is taxable to Clyborne as a dividend.

## II. *Depletion Issue.*

### FINDINGS OF FACT.

Paragon acquired by assignment written leases on the coal in and underlying the land here involved in Buchanan County, Virginia, which leases required the lessee to mine either all or 85 percent of the minable coal in and underlying the tracts under lease.  Paragon assumed all the obligations of the lessees under the leases, and was

obligated to pay annual minimum royalties, tonnage royalties, and land taxes. After acquiring the leases, Paragon made substantial investments necessary for mining, processing, and marketing the coal underlying the leased boundaries, including construction and maintenance of a tipple, processing equipment, a powerline, a railroad sidetrack with four spurs running under the tipple, and a road from the tipple around the mountain close to the outcrop line of the coal over which coal could be trucked from the mines to the tipple. Paragon chose not to mine the coal itself but contracted the mining out to various individuals and firms who were to mine the coal at their own expense and deliver the coal to Paragon's tipple. Paragon would then clean and size the coal and sell it on the market.

Petitioners Lee, Wesley, and Watson formed a partnership called Standard Smokeless Coal Company in 1953, and entered into an oral agreement with Paragon to mine the coal from a certain area of the Paragon lease. Standard mined coal from the Paragon property under this agreement during each of the calendar years 1954, 1955, and 1956. The above petitioners were partners in Standard in each of those years and petitioner Jack became a partner during the year 1956.

Petitioners Wesley, Bowling, and Watson formed another partnership in 1954 or 1955 known as Kyva Mining Company and entered into an oral agreement with Paragon to mine coal from another location or area included in the Paragon lease. In 1956 Kyva bought the equipment and mining rights of Sampy Lester, who was operating a mine adjacent to the Kyva mine under oral agreement with Paragon, for $3,500, all of which it allocated to depreciable assets on its books and claimed depreciation thereon. Kyva produced coal under these agreements during each of the calendar years 1955 and 1956, and the above-named petitioners continued to be partners therein except that Bowling was not a partner after 1955 and petitioner Jack became a partner in the year 1956.

Petitioners Lee, Wesley, and Bowling formed another partnership in 1956 known as Farwest Coal Company and bought out the equipment and interests of Meadows Coal Company, which had been producing coal from still other areas or locations included in the Paragon leases under an oral agreement between Meadows and Paragon made in 1954. Farwest agreed to pay Meadows approximately $21,000 for its equipment and mining rights and allocated the entire amount to equipment on its books which it depreciated for tax purposes. Farwest obtained the consent of Paragon before buying out Meadows. Farwest produced coal from the mine originally opened by Meadows during the year 1956. The above-named petitioners were the partners therein during the year 1956 and petitioner Jack became a partner in 1957.

Coal was also mined under the Paragon leases at different locations by C. W. Stilwell and S. W. Stilwell, operating as partners under the trade name of Bare Ridge Coal Company, during Paragon's taxable years ending September 30, 1955, 1956, and 1957, under an oral agreement made in 1951 between Paragon and the Stilwells; by Sherman Meadows, operating as Meadows Coal Company, during Paragon's taxable years ending September 30, 1955 and 1956, under an oral agreement entered into between Paragon and Meadows in 1954, the rights in which were assigned by Meadows to Farwest in 1956 as mentioned above; and by Sally Mining Company, a partnership comprised of George Beall and Lloyd Conley, during Paragon's taxable years ending September 30, 1955, 1956, and 1957, under an oral agreement entered into between Paragon and the partners in 1955. The Stilwells, Meadows, and Beall and Conley are not petitioners herein but Paragon claimed depletion on the coal mined by them during its taxable years here involved as it did on the coal mined by Standard, Kyva, and Farwest as above mentioned.

Most of the oral agreements here involved were made between the contractors and Paragon's then superintendent, Grogan, who died before the trial of this case. Consequently, it is impossible to determine with any certainty the exact terms of the oral agreements. However, based on the evidence presented and the conduct of the parties, the oral contracts between Paragon and the original contractors appear to have been arrived at in the following manner and to include the following provisions.

As Paragon extended a road around the side of the mountain a prospective contractor would be taken to various proposed sites for mine openings. When the contractor had chosen a particular site the representative of Paragon would point out on an overall property map, or with his arms on the surface of the ground, the general area in which the contractor could mine. The contractor agreed to mine the coal in that area and to deliver it to Paragon at its tipple at his own expense. Paragon usually would face up the site for the mine portal but the contractor was required to provide his own men, equipment, chutes, and bins, and to extend a road from the road built by Paragon to the mine portal if necessary. All expenses of opening and operating the mine were borne by the contractor. The contractor did not assume any of Paragon's obligations under its leases and paid no royalties or taxes on the property or the mineral interest.

Paragon agreed to pay the contractor a fixed price per ton for coal delivered to its tipple, less 2½ percent for rejects. It was understood that the price might vary from time to time. The price paid by Paragon to the various contractors did vary up and down from time to time, depending somewhat on the general trend of market prices for

the coal over extended periods and to some extent on labor costs. However, price changes made by Paragon to the contractors were always prospective and the contractors were notified several days in advance of any price change so that they always knew the price they would get for coal when they delivered it to the tipple. The contractor had no further control over the coal after it was delivered to Paragon's tipple and did not know how or for what price Paragon sold or otherwise disposed of the coal.

The contractor agreed either to provide his own power with his own compressors or to buy power from Paragon at a fixed rate per ton; in the latter event the contractor was required to convert the current from a.c. to d.c. at his own expense. The contractor also agreed to pay a certain amount per ton for engineering services inside the mine rendered by an engineer provided by Paragon. Paragon was to pay for all engineering services outside the mine.

After the agreement was made the engineer employed by Paragon provided the contractor with a mine map for his mine with projections thereon at approximately 60-foot intervals showing the general direction in which the mine should progress. Inasmuch as the various mines opened up around the side of the mountain all headed generally toward the center of the mountain, the engineer would indicate on the mine maps where barriers between adjacent mines should be left so that one contractor did not break through into the mine of the adjacent contractor. The engineer also set spads for the contractor to indicate the general direction in which he was to mine. The engineer extended the projections from time to time and also provided the contractors with mine maps showing the areas mined, the remaining pillars, etc., at about 6-month intervals. Paragon insisted on all contractors using the same engineer, who could project a system for mining all the coal under its leases without leaving unrecovered pockets of coal and to prevent one contractor from breaking into the mine of another contractor. The contractors were required to obtain Paragon's permission before pulling pillars as they retreated from an area which had been mined. The contractors usually tried to develop their mines to produce a specified tonnage of coal per day, without which they did not think they could operate at a profit. It often took some time to develop a mine to this production stage.

At the time the oral contracts were entered into nothing was said about who was entitled to depletion, although Paragon expected to claim depletion and fixed the price it would pay the contractors with that in mind.

The contracts were not made for any specific period of time and nothing was said about the right to terminate by either party at the time the agreements were entered into. Numerous contractors ceased

mining from time to time as they found they were unable to mine coal profitably or for other reasons of their own. Contractors who ceased mining were not permitted to remove buildings from the premises but usually took their equipment with them unless they had borrowed money from Paragon with the equipment as security. It was anticipated by both parties that a contractor would continue mining in the location assigned to him as long as the coal could be mined and sold at a profit and as long as the contractor employed proper mining methods and produced coal meeting Paragon's specifications.. The contractors were not obligated to mine any specific amount of coal and were not specifically given the right to mine any particular area to exhaustion. The projections of the mines were based somewhat on the speed with which the contractor produced the coal in his area. If, with proper mining methods, he reached a point where he might intersect another mine as projected, the first contractor to reach the point of intersection might be given the right to pierce the indicated barrier between the two mines and mine on forward. Also, if an adjacent mine ceased operating, the contractor was often permitted to pierce the indicated barrier between the two mines and recover the coal which would normally have been reached through the discontinued mine.

During the years here involved, Paragon took all merchantable coal produced by the various contractors operating on Paragon's leased property and paid the contractors the price fixed by Paragon. Paragon sold very little of its coal under contract and the prices it obtained for coal varied quite frequently. If Paragon was unable to take all of the contractors' coal either because of lack of coal cars or because its tipple was full, the contractor would fill his own bins and then shut down until Paragon could take more of his coal.

The contractors completed their obligations under the contracts by delivering the coal to Paragon's tipple and thereupon became entitled to their compensation for mining the coal by virtue of Paragon's personal covenant to pay them so much per ton. The contractors were not concerned with the sales price Paragon received for the coal.

The contractors paid nothing for the privilege of mining coal other than their investment in equipment, roads, and buildings, and their cost in opening the mine and mining the coal. They acquired no legal title either to the coal in place or to the coal after it was mined. The coal as delivered to Paragon's tipple by the contractors was not in a state which was salable to the consumer but had to be washed, graded, and treated in order to be salable upon the consumer market. All such processing was done by Paragon at its processing plant. The contractors sold none of the coal to anyone other than Paragon and were not entitled to do so.

During its taxable years ending September 30, 1955, 1956, and 1957, Paragon paid the following amounts to the following partnerships for coal produced under the above oral agreements:

| | September 30— | | |
| --- | --- | --- | --- |
| | 1955 | 1956 | 1957 |
| Standard | $151,368.53 | $146,877.01 | $134,535.80 |
| Kyva | 57,542.58 | 160,247.83 | 190,509.24 |
| Farwest | | | 165,560.70 |
| Bare Ridge | 298,297.63 | 258,435.03 | 269,532.59 |
| Sally | 10,162.17 | 66,907.54 | 71,117.70 |
| Meadows | 301,635.27 | 183,738.74 | 18,496.06 |
| Total | 819,006.18 | 816,206.15 | 849,752.09 |

Paragon claimed percentage depletion on the above amounts on its income tax returns for the above years.

Standard and Kyva received the following gross receipts from their operations under the Paragon leases, and claimed percentage depletion on those amounts on the partnership returns for the calendar years following:

| | 1954 | 1955 | 1956 |
| --- | --- | --- | --- |
| Standard | $103,850.66 | $154,457.69 | $145,741.26 |
| Kyva | | 78,623.18 | [1] 191,374.59 |

[1] According to stipulation of the parties. However, a lesser amount was shown on the return for Kyva for the year 1956 and percentage depletion computed accordingly. Kyva did receive gross receipts in 1956 in the amount shown above.

Respondent disallowed the above deductions for depletion claimed by both Paragon and the contract miners but agreed at the trial that either Paragon or the contract miners are entitled to the depletion deduction, but not both.

OPINION.

Section 611 provides that in the case of mines there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion to be made under regulations prescribed by the Secretary or his delegate. In the case of a lease the deduction under this section shall be apportioned between the lessor and lessee. Section 613 provides that the allowance for percentage depletion of coal shall be 10 percent of the gross income from the property, excluding an amount equal to rents or royalties paid, such allowance not to exceed 50 percent of the taxpayer's taxable income from the property. The gross income from the property is defined as gross income from mining.

There have been numerous cases involving the question of who is entitled to percentage depletion with respect to the production of minerals. In *Palmer* v. *Bender*, 287 U.S. 551 (1933), the Supreme Court

held that the language of the statute is broad enough to provide a deduction for any taxpayer who "has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." The Court further said that the deduction is not "dependent upon the particular legal form of the taxpayer's interest in the property to be depleted * * *. It is enough if * * * he has retained a right to share in the oil produced. If so, he has an economic interest in the oil, in place, which is depleted by production." This concept of an economic interest in the mineral in place has been adopted by the courts and the regulations as the factor determining whether a taxpayer is entitled to depletion, but the question of what gives a taxpayer an economic interest in the mineral in place has posed many problems. For instance, in *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362 (1938), the Supreme Court said that the "phrase 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit."

Where a lessee enters into an agreement with the owner of the mineral interest, coal in this case, giving the lessee the right to mine and remove all the coal in a seam or seams underlying a specified tract of land and obligating the lessee to mine and remove (or pay for) all or a specified percentage of the minable and merchantable coal in the seam or seams and to pay to the owner a royalty of so much per ton for each ton of coal mined or minable, usually with a minimum annual royalty, and under which agreement the lessee has the right to sell the coal for whatever price he can obtain and retain the proceeds, there would seem to be no question that the lessee has acquired an economic interest in the coal in place, which is depleted by production and which, under the statutory scheme entitles the lessee to the percentage depletion deduction, based on his gross income from mining, less rents and royalties paid.

Paragon meets the above requirements and, not having assigned or sublet its leases, it is entitled to the depletion deduction based on its entire gross income from the property, less rents and royalties paid, unless it has, by its agreements with the mining contractors, surrendered all or a part of its capital interest in the coal in place, or the contractors have in some manner acquired an economic interest in the coal in place which would entitle them to the depletion deduction on that part of the gross income from the property equal to the amount they receive for mining the coal. It is clear that if the contractors are entitled to a depletion deduction on the amounts earned under their contracts, the amount allowable to Paragon for depletion of its economic interest in the coal would be correspondingly reduced, *Parsons*

v. *Smith*, 359 U.S. 215 (1959). The contractors here have not acquired any interest in the coal by purchase or lease from the landowners or their lessees, and consequently their right to the depletion deduction rests entirely on the interests they acquired under their contracts with Paragon. It is this situation, where the owner or lessee of coal in place chooses not to mine it himself but enters into a contract with an independent contractor to mine the coal for him, that has given rise to most of the controversies in recent years over which party is entitled to the depletion deduction. Respondent correctly agrees that one of the two parties is entitled to depletion on the amount paid the contractor, but not both.

We believe much of the uncertainty in this area was removed by the Supreme Court's decision in *Parsons* v. *Smith, supra.* In that case, after reviewing the history of the depletion deduction, the Court said, "In short, the purpose of the depletion deduction is to permit the owner of a capital interest in mineral in place to make a tax-free recovery of that depleting capital asset." In the two cases there involved the facts were quite similar to those here involved except that in one case, which involved an oral agreement, it was agreed that if either party wanted to quit, all that was necessary to terminate the arrangement was the giving of a 10-day notice, and in the second case, which involved a written contract, it was expressly provided that the owner of the coal lands could terminate the agreement at any time upon 30 days' written notice, without specifying any reason therefor. The contractors there argued that their contractual right to mine coal from the designated lands and the use of their equipment, organizations, and skills in doing so should be regarded as the making of a capital investment in, and the acquisition of an economic interest in, the coal in place. The Court, referring to the assertion as a legal fiction, refused to indulge in the fiction because it found the fiction was negated by the facts. The opinion set forth the facts which the Court found to be opposed to the asserted fiction, being (1) that the contractors' investment was in equipment, not in coal in place; (2) their investment was recoverable through depreciation of the equipment; (3) the contracts were terminable on short notice; (4) the landowners did not agree to, nor did they, actually surrender any capital interest in the coal in place; (5) the coal at all times belonged to the landowners and the contractors could not sell or keep any of it, but were required to deliver all coal to the landowners; (6) the contractors were to be paid a fixed sum for each ton mined and delivered and were not to have any part of the proceeds of the sale of the coal; (7) the contractors had to look only to the landowners for all sums to come due them under their contracts.

As mentioned above, we find that the obligations and rights of the parties here involved are similar in most respects to those involved in

the *Parsons* case except there was no specific right to terminate mentioned in the agreement between the parties.[15]  While such right on the part of the landowner to terminate an agreement on short notice and without cause may go far toward limiting the contractor's right to the depletion deduction, we do not think the absence of a specific right to terminate necessarily gives the contractor an economic interest in the coal in place.   We do not think that a contractor's investment in depreciable equipment and other property required to mine and remove coal, and the necessary expense he incurs in opening and operating a mine, gives him a depletable economic interest in the coal in place, where the contract, under which he is authorized to mine the coal and upon which his right to the depletion deduction rests entirely, simply authorizes him to mine the coal in a general area for an indefinite period with no obligation on his part to pay anything for the coal, or to continue mining until the supply of coal is exhausted, and does not permit him to sell the coal on the open market after it is mined.   In our opinion such a contractor, by his investment, may obtain an economic advantage derived from production but does not acquire an economic interest in the coal in place.

Here the contractors paid nothing for the coal while Paragon was obligated under its leases to pay a minimum annual royalty and a tonnage royalty on all coal mined, was required to pay taxes on the land and the mineral in place, and was required to remove, or pay a royalty for, at least 85 percent of the minable and merchantable coal.   While there is some implication in the testimony that the contractors might have been entitled to sell the coal they produced elsewhere had Paragon not taken it all, this is refuted by the positive testimony of the representatives of Paragon that all coal had to be delivered to Paragon, supported by the fact that all coal was delivered to Paragon, and the absence of any explanation why Paragon, which was obligated to pay a royalty on the coal, would permit the contractors, who had paid nothing for the coal and who had no legal title to the coal, to sell it elsewhere.   These facts and others indicate that Paragon did not intend to nor did it actually surrender any capital interest in the coal in place to the contractors.   In fact, most of the contractor-petitioners in this case disclaim any capital investment in the coal in place—the unmined coal.   As said by the Supreme Court in *Parsons* v. *Smith, supra,* "Surely these facts show that petitioners did not actually make any capital investment in, or acquire any economic interest in, the coal in place, and that they may not fictionally be regarded as having done so."   The facts in *Parsons* v.

---

[15] The testimony on this point is conflicting but we have concluded from all the evidence that the right to terminate was not specifically mentioned when these oral agreements were entered into.   There is evidence that Paragon's superintendent had no authority to negotiate agreements that were not terminable at the will of the parties.

*Smith, supra,* indicate that petitioners' investments there were similar to the investments of the contractors here.

Furthermore, the contractors had no interest in the coal legally or otherwise after they had delivered it to Paragon. They were paid a fixed price per ton for coal delivered and had no knowledge or interest in the price that Paragon received from the sale of the coal to the consumer. While there is some evidence that the amount paid by Paragon fluctuated somewhat with extended changes in the market price of coal and changes in labor costs, there is no evidence that the amount paid by Paragon was directly related either to the price it was getting for the coal or to the sales price of a particular contractor's coal, and the amount was apparently changeable at the will of Paragon. It is also undisputed that the contractor knew the fixed sum he would receive before he delivered the coal. In other words, the contractor had to rely on the personal covenant of Paragon for payment for his services rendered in producing the coal.

It is not clear from the evidence whether the contractors were given any specific boundary of coal to mine. The evidence rather indicates that the contractors were given a general area in which to mine under the supervision of an engineer who was authorized to plan a system of mining for the extraction of all the minable coal in the seam and who was authorized to change the projection of any contractor's mine in order to accomplish this objective. The contractors testified that the area they were given the right to mine was indicated to them by Paragon's superintendent either pointing out a general area on the surface of the ground or placing his hand on a property map which showed only the outcrop line of the coal with no division of the coal underground. Later the engineer provided mine maps with barriers shown thereon, but we believe the barriers were shown primarily to prevent adjacent contractors from breaking through into each other's mines and to equalize the rights of the miners according to their capabilities under a planned system of mining, and were not intended to specify definite boundaries for the areas of coal the contractor was entitled to mine. As pointed out by Paragon's present superintendent, Paragon did not know at the time the agreements were made what equipment and skills a particular contractor would use or how long he would stay, and because of the numerous rolls or faults characteristic of this seam of coal, it could not be determined in advance from just what direction the coal in an area would have to be mined to recover all minable and merchantable coal. But inasmuch as Paragon was obligated under its leases to remove at least 85 percent of the coal, the areas given to a particular contractor had to be and remain flexible.

The evidence is conflicting as to whether the contractors were given the right to mine a specific area of coal to exhaustion. However, there is very little conflict in the evidence that the contractors

were not *obligated* to mine any boundary of coal to exhaustion and, in fact, many of them quit at any time they chose. It seems unlikely that the parties would have contemplated granting the contractor the nonterminable right to mine specific areas to exhaustion without also obligating him to so mine it. Furthermore, Paragon could not give an absolute nonterminable right to mine to exhaustion in view of the landowner's reserved rights under the Paragon lease to terminate in the event of noncompliance with the terms of the lease. While we cannot find that the right to terminate was specifically mentioned when the agreements were made, neither can we conclude that the agreements were nonterminable.

On the facts in this case we conclude that the contractors could look only to the difference in their cost of mining the coal and the amount Paragon paid them for a return of their investment, that they made no investment in and acquired no economic interest in the coal in place, and that consequently they are not entitled to depletion on the coal they produced. As a result we conclude that Paragon did have an economic interest in the coal in place and is entitled to deduct depletion from the gross income it received therefrom without reduction for the amount it paid the contractors.

We recognize that the Court of Appeals for the Fourth Circuit held in *Stilwell* v. *United States*, 250 F. 2d 736 (1957), that one of the contractors producing coal on the property here involved, under an oral agreement presumably similar to the agreements made with the contractors herein, was entitled to depletion on the coal he produced under the agreement for the year 1952. The Court of Appeals, in reversing the District Court, found that the contractor's expenditures for equipment, a tipple at the mine entry, powder house, and powerplant, and tracks inside the mine, while not of themselves amounting to an investment in the coal in place, did indicate that the parties did not intend the contract to be terminable so long as the contractor's operations were satisfactory and the coal could be profitably marketed. However, we must decide this case on the evidence presented here, and we cannot conclude from that evidence that the contractors had a nonterminable right to mine the coal in any specific area to exhaustion. Without such right we do not believe that under the doctrine of *Parsons* v. *Smith, supra,* decided after *Stilwell,* the investment of these contractors in depreciable equipment and other property required to mine, remove, and deliver the coal gave them an economic interest in the coal in place which would entitle them to the depletion deduction. See *United States* v. *Stallard,* 273 F. 2d 847 (C.A. 4, 1959); *Utah Alloy Ores, Inc.,* 33 T.C. 917 (1960); *Walter Bernard McCall,* 37 T.C. 674 (1962), on appeal (C.A. 4); *J. Shelton Bolling,* 37 T.C. 754 (1962); *William M. Legg,* 39 T.C. 30 (1962), all decided subsequent to *Parsons* v. *Smith, supra.* Cf. *Denise*

*Coal Company* v. *Commissioner*, 271 F. 2d 930 (C.A. 3, 1959), reversing an opinion of this Court on the issue here material, 29 T.C. 528 (1957), entered prior to the decision of the Supreme Court in *Parsons* v. *Smith, supra.*

> Decision will be entered for the respondent in Docket No. 84124.
>
> Decisions will be entered under Rule 50 in Docket Nos. 84122, 84123, 84125, 84126, 90765, and 90766.