Cecil C. Lawson and Edna Lawson, et al. [1] v. Commissioner. Lawson v. Commissioner
Dockets 92158-92170, 92449-92458, 93607.
United States Tax Court
T.C. Memo 1963-179; 1963 Tax Ct. Memo LEXIS 165; 22 T.C.M. (CCH) 851; T.C.M. (RIA) 63179; June 27, 1963
John Y. Merrell, Washington, D.C., for petitioners. John J. Larkin, for respondent. KERN Memorandum Findings of Fact and Opinion In these consolidated proceedings respondent determined deficiencies in petitioners' Federal income taxes in the amounts and for the years as follows: Docket No.
Petitioners
Year
Deficiency
92158
Cecil C. Lawson and Edna Lawson
1957
$1,438.93
1958
1,557.21
92159
Quentin H. Lawson and Hazel Lawson
1957
1,555.14
1958
1,273.25
92160
Leo E. Lawson and Velma Lawson
1957
1,549.94
1958
1,458.27
92161
Charles Salyers and Stella Salyers
1957
539.83
1958
646.05
1959
360.54
92162
Charles E. Salyers
1957
619.94
1958
772.24
1959
484.54
92163
James A. Salyers and Gay Nell Salyers
1957
539.83
1958
646.05
1959
360.54
92164
Junior Short and Sylvin Short
1957
532.55
1958
373.20
92165
Marvin B. Whitt and Edith L. Whitt
1957
578.64
1958
550.00
92166
Dalley Wade and Blanche Wade
1957
623.17
1958
375.00
92167
Paul Shortt and Ilene Shortt
1957
549.86
1958
185.38
92168
Henry Blankenship and Bessie Blankenship
1957
$ 549.86
1958
185.38
92169
Evans Horn and Sadie Horn
1957
792.84
1958
656.68
92170
Elster Horn and Vernell Horn
1957
745.94
1958
303.34
92449
Henry F. Harmon
1957
158.58
1958
392.54
92450
Glen Harmon and Magaline Harmon
1957
824.48
1958
48.75
92451
Walter Keen and Sarah Keen
1957
153.58
1958
162.54
92452
Clell P. Vance and Nella Vance
1957
758.77
1958
759.62
92453
Neely E. Vance and Tera Vance
1957
531.20
1958
292.14
92454
Trevert R. Vance and May Vance
1957
48.62
1958
194.47
92455
Andy Short and Ethel Short
1956
428.32
1957
57.31
1958
375.01
92456
Emory Short and Marie Short
1956
314.78
1957
339.65
1958
328.68
92457
Carl Ball and Pansy Ball
1956
308.32
1957
65.31
1958
340.01
92458
Edward Messick and Rose Messick
1957
636.79
1958
510.51
93607
Andrew Whited, Jr., and Frances Whited
1957
548.17
1958
168.48
1959
471.02
*166 In the cases of Trevert R. Vance and May Vance, Docket No. 92454, and Carl Ball and Pansy Ball, Docket No. 92457, respondent determined additions to tax, pursuant to section 6651(a) of the Internal Revenue Code of 1954, in the respective amounts of $19.45 and $24.65 for the year 1958. Petitioners have not assigned error to these determinations, nor have they offered any evidence with respect to these determinations. We therefore assume that petitioners have conceded the correctness of the assertions of the additions to tax in the notices of deficiency. The only question presented for our decision is whether the petitioners are entitled to percentage depletion on income derived from mining coal under oral agreements with New Garden Coal Corporation or Swords Creek Coal Corporation. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our Findings by this reference. Petitioners are individuals residing in southwest Virginia and filed their Federal income tax returns for the years involved herein with the district director of internal *167 revenue at Richmond, Virginia. The wives of some of the petitioners are parties to these proceedings solely by reason of their participation in joint returns. Further reference to petitioners will be with respect to the male petitioners only. Petitioners were engaged in the coal mining business as coal operators during the years in question as individuals or as partners in various partnerships. Petitioners Clell P. Vance and Neely E. Vance, trading as N. E. Vance Coal Company, a partnership, produced coal under an oral agreement with Swords Creek Coal Corporation, sometimes hereinafter referred to as Swords Creek. All of the remaining petitioners produced coal under oral agreements with New Garden Coal Corporation, sometimes hereinafter referred to as New Garden. New Garden and Swords Creek were owned by the same interests, and the various agreements each company had with petitioners were substantially the same. New Garden obtained by lease from third parties the right to mine the coal in place to exhaustion. The record does not indicate the nature of Swords Creek's interest in the property leased to N. E. Vance Coal Company. However, the case was tried and argued on the assumption, *168 which we shall accept, that Swords Creek possessed a depletable interest in the coal in place which it may or may not have surrendered to petitioners. Petitioners herein operated underground drift mines, in which a horizontal coal seam in a mountain is reached by clearing away a part of the mountainside with a bulldozer. Two openings are made into the coal seam. One is an entry and the other is an air core which is used to ventilate the mine. Coal is removed from the coal seam as the drift mine is driven back. The coal seam is approximately 24 to 30 inches in height. The mine itself is approximately as high as the height of the coal seam and is approximately 24 to 30 feet wide. The roof of the mine is supported by leaving a certain amount of coal in place known as pillars, and also by erecting wooden supports known as timbers. When the mine is driven to its full extent, which may be some three or four thousand feet, the pillars of coal are removed as the miners retreat. The coal is obtained from the seam either by cutting it on the bottom with a machine which yields a lump coal, or by a "solid-shot" method which yields a fine powder. Petitioners employed men and supplied at their *169 own expense movable equipment usable elsewhere to carry on their operations. The equipment included rubber-tired carts approximately 8 feet long, 5 feet wide, and 10 inches deep on which the coal is loaded and brought to the surface, an electric-powered locomotive to pull the carts, fans, motors, a motorbarn, a diesel house, powerlines, and other miscellaneous items. Each petitioner also built near the entry of his mine a coal chute and storage bin known as a tipple, which could be moved by tearing it down and rebuilding it on another site, although it was considered more economical in some instances to construct a new tipple than to remove and reconstruct an old one. Coal is carried by truck from the tipple to a coal processing plant. Petitioners hauled coal from the mines to the processing plants in their own trucks and in addition they hired others to do the trucking work. All of the equipment used by petitioners was of the type subject to deductions for depreciation. Petitioners also deducted the cost of materials used in their operations such as powder and timbers. New Garden held the property upon which petitioners operated by leases acquired from Coal Mountain Mining Company *170 and Commonwealth Coal Corporation. Pursuant to the leases New Garden received the right and was obligated to remove all merchantable and minable coal, and it was obligated to pay annual minimum royalties, tonnage royalties, and all taxes assessed on the land, improvements, and coal. New Garden also agreed to work and mine all coal in an efficient, workmanlike manner, and in conformity with the laws of Virginia and of the United States. The owners of the property held by New Garden under lease retained the right to inspect the mining operation, and required that New Garden furnish them maps of the various mining operations. The leases provided that New Garden's failure to perform any of the terms, conditions, covenants, or agreements contained therein would result in a forfeiture of the leases with rights in the lessors to reenter and take possession of the leaseholds. New Garden performed the conditions set forth in the lease, including the payment of real estate taxes on the mineral rights. New Garden did not mine the coal itself but contracted the mining out to various individuals who were to mine the coal at their own expense and, subject to exceptions later referred to herein, *171 deliver the coal to New Garden's tipple. New Garden cleaned and processed the coal into various grades, such as lump, egg, stove, nut, stoker, and nut and slack. Prices for which New Garden sold the coal depended on grade and varied between $9.01 and $4.81 per ton during the period beginning January 1956 and ending December 1958. All of the petitioners herein except Clell P. Vance and Neely E. Vance operated as partners or individuals under oral agreements with New Garden. Petitioner Andrew Whited, Jr., carried on a mining operation from May 13, 1957, to November 31, 1958, under an oral agreement with New Garden which was similar to those under which the other petitioners operated. From an undisclosed day in December 1958 to February 2, 1962, he carried on a different mining operation involving the mining of an inferior type of coal under an oral agreement with Stone and Smith Coal Company, which in turn operated under an agreement with New Garden. His operation under the agreement with Stone and Smith Coal Company is referred to hereinafter in greater detail. * The following chart shows the forms of business organization under which petitioners carried on their operations, and the *172 gross income and net income earned by the partnerships or proprietorships for the years indicated, upon which amounts depletion deductions were claimed: Partnership or
Gross
Net
Petitioner
Sole
Year
Income
Income
Proprietorship
Cecil C. Lawson
Lawson Brothers
1957
$200,555.32
$46,083.13
Coal Company
Quentin H. Lawson
1958
182,723.58
40,435.93
Leo E. Lawson
Charles Salyers
Salyers Coal
1957
83,668.30
17,783.65
Company
Charles E. Salyers
1958
107,173.61
20,621.66
James A. Salyers
1959
89,455.83
12,726.18
Junior Short
N.S. and W. Coal
1957
88,932.20
20,505.43
Company
Marvin B. Whitt
1958
84,540.72
17,040.61
Elbert Newberry
(not a petitioner)
Dalley Wade
Sole
1957
31,557.18
5,731.31
Proprietorship
1958
21,887.11
3,684.89
Paul Shortt
P.H.I. Coal
1957
101,244.97
11,209.24
Company
Henry Blankenship
1958
86,431.00
6,791.12
Evans Horn
Horn Coal
1957
115,018.43
16,731.06
Company
Elster Horn
1958
87,259.17
13,500.58
Henry F. Harmon
H.H. and K. Coal
1957
15,519.19
2,519.00
Company
Glen Harmon
1958
65,970.45
11,026.66
Walter Keen
Glen Harmon
C. and H. Coal
1957
81,109.70
16,692.25
Company
A. C. Coxton (not a
petitioner)
Clell P. Vance
N. E. Vance Coal
1957
64,713.37
10,649.45
Company
Neely E. Vance
1958
56,444.41
5,400.76
Clell P. Vance
Clell's Mining
1957
40,630.66
5,785.08
Company
Trevert R. Vance
1958
73,739.10
10,941.34
Andy Short
Shorts and Ball
1956
51,287.42
19,322.06
Coal Company
Emory Short
1957
51,327.94
10,189.58
Carl Ball
1958
53,221.38
15,854.40
Edward Messick
Sole
1957
77,385.98
6,097.26
Proprietorship
1958
62,416.51
3,632.10
Andrew Whited, Jr.
Webb and Whited
1957
87,863.39
19,361.08
Coal Company
Harmon Webb (not a
1958
67,721.94
13,186.70
petitioner)
1959
76,756.59
21,045.70
Major Webb (not a
petitioner)
*173 J. P. Shockey and William H. Van Dyke were the mining superintendents for New Garden and Swords Creek, respectively, and they negotiated the oral agreements here involved on behalf of their corporations with the petitioners. Pursuant to the agreements, New Garden and Swords Creek would build roads to prospective mine sites. New Garden also supplied materials to petitioners which they used to maintain the roads. New Garden and Swords Creek usually would face up the site for the entries to the mines, and they supplied engineering services to direct the areas to be mined. The petitioners agreed to mine the coal in their areas in a workmanlike manner. They provided their own men, equipment, and power, built their own tipples, and delivered the coal to the processing plants at their own expense. The petitioners were responsible for accidents which might occur in their operations, and they carried workmen's compensation insurance. The operators did not assume any of New Garden's obligations under its leases to pay royalties or taxes on the mineral interest. The operators on New Garden's property, with the exception of petitioner Andrew Whited, Jr., *174 with regard to his operations under the agreement with Stone and Smith Coal Company, ** were required to deliver the coal to New Garden's tipple unless New Garden decided not to take it and so notified petitioners. On occasion New Garden did not take coal which was high in sulphur or ash content or too wet, or when its processing plant was not in operation. The prices per ton paid by New Garden and Swords Creek to the operators varied slightly with the prevailing market conditions, but the operators were advised before delivering coal to New Garden or Swords Creek of the amounts that would be paid. The rate petitioners were paid for coal delivered to New Garden was generally $3.85 per ton from January 1956 through September 1956 and $4.05 per ton from October 1956 through December 1958. Petitioners received approximately the same prices for the relatively smaller amount of coal delivered to other processing plants. Petitioners were not limited in the amount of the coal they could extract from an entry. If New Garden could not or did not take any coal produced by the operators and so notified them, the operators were permitted by New Garden to dispose of it elsewhere on the condition *175 that New Garden was paid a royalty of 25 cents per ton of coal delivered elsewhere. In some cases the petitioners would receive the full purchase price and remit the royalty to New Garden; in other cases the purchasers would deduct and remit the royalty to New Garden and petitioners would receive the purchase price less the royalty. In those exceptional cases when New Garden allowed petitioners to deliver coal elsewhere that permission was granted in order that petitioners would not lose their working crews, and in order to prevent the coal in the mines from becoming damp and therefore unmarketable. Petitioners Clell P. Vance and Neely E. Vance, one of whose operations was on Swords Creek's property in the form of a partnership known as N. E. Vance Coa. Company, were permitted to sell coal elsewhere when they began mining in the early part of 1955, with the understanding that Swords Creek was entitled to receive all or any part of the coal so mined if and when it desired to take it. Swords Creek agreed that the coal could be sold elsewhere only until it could use the coal and upon the condition that it received a royalty of 40 cents per ton. Beginning in the fall of 1955 most of *176 the coal produced by N. E. Vance Coal Company was delivered to Swords Creek pursuant to its rights under the contract. Swords Creek received a royalty of 30 cents per ton for the relatively small amount of coal delivered elsewhere. N. E. Vance Coal Company's rights to mine coal on Swords Creek's property were the same as the rights obtained by other petitioners to mine coal on New Garden's property. Petitioner Andrew Whited, Jr., was a partner in Webb and Whited Coal Company which operated pursuant to an oral agreement with Stone and Smith Coal Company on New Garden's property, from December 1958 to February 1962, at which latter time the mining operation was completed. Stone and Smith Coal Company had approximately eight operators on New Garden's property. The coal produced by Webb and Whited Coal Company was high in sulphur content and therefore unacceptable to New Garden. Webb and Whited Coal Company sold the coal it produced to Stone and Smith Coal Company until the end of 1959 or early 1960 at which time that company became bankrupt and ceased operations. Subsequently, coal was sold to other processing plants. Webb and Whited Coal Company was paid a predetermined fixed price *177 per ton for coal delivered to Stone and Smith Coal Company, and New Garden received a royalty for coal delivered to processing plants other than Stone and Smith Coal Company. After petitioners delivered the coal to New Garden's or Swords Creek's tipple or any other processing plant, they did not participate in the preparation of the coal for market nor in its disposition in the market, and they were not concerned with the sales price obtained by New Garden or other processing plants for the coal. New Garden's and Swords Creek's engineers determined the directions or projections of the various mines. They supplied petitioners herein with maps twice a year in accordance with Virginia's mining laws. These maps indicated the progress of the various mines and the directions in which they were to proceed. In addition, the engineers set "spads" in the mines which guided the direction of the mining operation. The contractors were required to obtain New Garden's permission before pulling pillars as they retreated from an area that had been mined. Certain nonmovable equipment, such as timbers, was not removed from the mines by the operators when they completed an operation. Because the *178 seams of coal rose and fell, sometimes pinched out, or were sometimes blocked by underground water streams, it was impossible to predict the length to which any mine could extend. If an area could not be reached from one entry it was assigned to another operator to approach from a different direction. If mines were driven adjacent to one another it was necessary for the engineers to prevent the mines from running into one another so that the air in the mines would not become polluted. Additionally, if adjacent operators progressed at varying speeds, the one who proceeded faster would be permitted to extract coal which would have otherwise been reached by the neighboring operator. Thus specific areas were not designated for petitioners to mine in all events to exhaustion. The custom of the trade under which petitioners operated was to extract the maximum amount of coal from a given entry. They were free to produce as much coal as they could for delivery to New Garden or others when New Garden did not take the coal. If the amount of coal recoverable from an entry was not sufficient to yield a profit to the operators, the superintendents assigned the operators to other locations, or *179 the operators merely ceased mining. Operators sometimes quit for reasons of their own without giving any notice to New Garden. In many instances operators purchased the equipment of other operators at a working mine and continued the mining operation. In these instances the purchase prices paid for equipment in an operating mine frequently exceeded the value of the equipment. It was the usual practice of the purchasing operator to obtain the consent of the mining superintendent before buying out another's interest. On its original Federal income tax returns for the years 1957, 1958, and 1959 New Garden did not claim depletion deductions on amounts paid to petitioners, but depletion deductions were claimed on such amounts in amended returns subsequently filed. At the time the oral agreements here in question were entered into nothing was said about termination by either party to the agreement. It was understood that the operators would mine the coal in a work-manlike manner, and that the mining would be carried on by the operator so long as it was profitable to him. The operators paid New Garden or Swords Creek nothing for the privilege of mining coal other than their investment *180 in equipment, roads, and buildings and their cost in opening the mine and mining the coal. The operators were not obligated to mine any specific amount of coal and were not specifically given the right to mine any particular area to exhaustion. Opinion KERN, Judge: The sole issue is whether petitioners, operating as sole proprietors or partners in partnerships, are entitled to deductions for depletion of coal deposits mined by them under oral contracts, pursuant to the provisions of sections 611 and 613 of the Internal Revenue Code of 1954. Petitioners contend that they received nonterminable and exclusive rights to mine coal deposits in designated areas to exhaustion and thereby obtained an economic interest in the coal in place which entitles them to depletion deductions. Respondent contends to the contrary, and argues that at most petitioners acquired an economic advantage for which petitioners are not entitled to depletion deductions. Section 611[2] provides that in the case of mines there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion to be made under regulations prescribed by the Secretary or his delegate. *181 In the case of a lease the deduction under this section shall be apportioned between the lessor and lessee. Section 613[3] provides that the allowance for percentage depletion of coal shall be 10 percent of the gross income from the property, excluding an amount equal to rents or royalties paid, and that such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property. Gross income from the property is defined as gross income from mining. *182 The Supreme Court has stated that an allowance for depletion for purposes of Federal income taxation is based on the theory that the extraction of a mineral deposit exhausts the capital investment in the deposit, and the deduction permits a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted the owner's capital is unimpaired. Commissioner v. Southwest Expl. Co., 350 U.S. 308, 312. In order for petitioners to be entitled to deductions for depletion, they must own an economic interest in the coal in place that represents a capital investment, as distinguished from a mere economic advantage derived from production through a contractual relation to the owner, by one who has no capital investment in the mineral deposit. Helvering v. Bankline Oil Co., 303 U.S. 362, 367; Palmer v. Bender, 287 U.S. 551, 557. See also Parsons before us except some of those in Docket v. Smith, 359 U.S. 215. Most of the basic facts in all of the cases No. 93607 are similar to those present in Robert Lee Merritt, 39 T.C. 257, and several of the arguments advanced by petitioners are refuted by *183 our opinion in that case. Here, as in that case, the operators were not given specific boundaries of coal to mine. See Robert Lee Merritt, supra at 282. Here, as in that case, the oral contracts between the operators and the owner of the leasehold interest in the coal-bearing land did not spell out specifically the rights of the owner of the leasehold with regard to the termination of the contractual relationship. In our opinion in that case (p. 281) we made the following pertinent statement with regard to this matter: While such right on the part of the landowner to terminate an agreement on short notice and without cause may go far toward limiting the contractor's right to the depletion deduction, we do not think the absence of a specific right to terminate necessarily gives the contractor an economic interest in the coal in place. We do not think that a contractor's investment in depreciable equipment and other property required to mine and remove coal, and the necessary expense he incurs in opening and operating a mine, gives him a depletable economic interest in the coal in place, where the contract, under which he is authorized to mine the coal and upon which his *184 right to the depletion deduction rests entirely, simply authorizes him to mine the coal in a general area for an indefinite period with no obligation on his part to pay anything for the coal, or to continue mining until the supply of coal is exhausted, and does not permit him to sell the coal on the open market after it is mined. In our opinion such a contractor, by his investment, may obtain an economic advantage derived from production but does not acquire an economic interest in the coal in place. As to these matters we reaffirm herein the views expressed by us in Robert Lee Merritt, supra.
In the instant case (again with the exception of one operation involved in * Docket No. 93607) the corporation which owned the leasehold interest in the land had the right to take all of the coal mined by the operators at predetermined prices with the understanding, however, that it would waive and forego this right, for reasons considered to be beneficial to it as the owner of the coal in place, if the coal proved to be of undersirable quality or if it had suspended the processing and sale of coal. The greater part of the coal mined by the operators was taken by New Garden *185 [4] at its processing plant. The sales of coal by the operators to others constituted the exceptions rather than the rule and were made only with the expressed consent of New Garden, which, in these exceptional instances, waived its rights to take all of the coal produced by the operators. Thus, New Garden had the right or option to take all of the coal produced by petitioners, but was not obligated to do so. See J. Shelton Bolling, 37 T.C. 754, 765. The fact that, under exceptional circumstances, New Garden waived its rights to take all the coal mined by petitioners and on occasion permitted its sale to other entities does not persuade us to a conclusion that the petitioners (in all cases except Docket No. 93607) had a depletable interest in the coal in place. See Raymond E. Cooper, 39 T.C. 253, 255, f.n. 2. We conclude that these petitioners did not have the general and unqualified permission to sell coal on the open market which we had in mind in our opinion in Robert Lee Merritt, supra.
*186 It is also our opinion that neither the understanding of the parties as to whether the petitioners or New Garden had a depletable interest in the coal nor the fact that New Garden at one time may not have claimed all the depletion allowance to which it might have been entitled "is of *** consequence so far as the incidence of taxation herein is concerned." William M. Legg, 39 T.C. 30, 41. In the instant cases we do not have before us written contracts definitely and specifically limiting the right of termination by the owner of the coal-bearing land. In this respect, among others, the instant cases are factually distinguishable from Elm Development Company v. Commissioner, 315 F. 2d 488, reversing a Memorandum Opinion of this Court. With regard to all of the docket numbers, with the exception of one operation involved in * Docket No. 93607, we decide the issue before us in favor of respondent. In Docket No. 93607, however, we have reached a different result with regard to the operation in 1959 under the *187 agreement with Stone and Smith Coal Company. ** On the somewhat meager facts before us which relate to petitioner Andrew Whited, Jr., we have concluded that he had *** the general and unqualified right to sell all of the coal which he mined under that agreement n[*] on the open market, which right was not subject to any option or overriding right on the part of New Garden. This coal was of a type and quality which New Garden was not interested in processing and selling. No coal mined by him was ever sold to New Garden. New Garden was interested only in obtaining a certain royalty per ton from Whited and it was of no concern to New Garden as to whom or at what price it was sold by Whited. These circumstances coupled with the absence of a definite and specific right of termination without cause or on short notice by New Garden cause us to conclude, under the rationale of the cited cases, that petitioner Andrew Whited, Jr. *188 n[*] Had a depletable interest in the coal which he mined under the agreement with Stone and Smith Coal Company and is accordingly entitled to a depletion deduction with regard to the income derived by him in the year 1959 from such operation. Petitioner Whited has not proved the amount, if any, of income derived by him from such operation prior to 1959. With regard to his operation under his agreement with New Garden in the years 1957 and 1958 our conclusion is the same as in the other Docket Numbers. By Tax Court order, 8/8/63, all of the material from this point to the end of the paragraph was substituted for the words "had a depletable interest in the coal in place, and we decide the issue before us in Docket No. 93607 in favor of petitioner".
Decisions will be entered for the respondent in all Dockets except Docket No. 93607. Decision will be entered under Rule 50 in Docket No. 93607. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Quentin H. Lawson and Hazel Lawson, Docket No. 92159; Leo E. Lawson and Velma Lawson, Docket No. 92160; Charles Salyers and Stella Salyers, Docket No. 92161; Charles E. Salyers, Docket No. 92162; James A. Salyers and Gay Nell Salyers, Docket No. 92163; Junior Short and Sylvin Short, Docket No. 92164; Marvin B. Whitt and Edith L. Whitt, Docket No. 92165; Dalley Wade and Blanche Wade, Docket No. 92166; Paul Shortt and Ilene Shortt, Docket No. 92167; Henry Blankenship and Bessie Blankenship, Docket No. 92168; Evans Horn and Sadie Horn, Docket No. 92169; Elster Horn and Vernell Horn, Docket No. 92170; Henry F. Harmon, Docket No. 92449; Glen Harmon and Magaline Harmon, Docket No. 92450; Walter Keen and Sarah Keen, Docket No. 92451; Clell P. Vance and Nella Vance, Docket No. 92452; Neely E. Vance and Tera Vance, Docket No. 92453 Trevert R. Vance and May Vance, Docket No. 92454; Andy Short and Ethel Short, Docket No. 92455; Emory Short and Marie Short, Docket No. 92456; Carl Ball and Pansy Ball, Docket No. 92457; Edward Messick and Rose Messick, Docket No. 92458; Andrew Whited, Jr., and Frances Whited, Docket No. 93607.↩
*. See footnote on page 854.↩
2. SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION. (a) General Rule. - In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate. (b) Special Rules. - (1) Leases. - In the case of a lease, the deduction under this section shall be equitably apportioned between the lessor and lessee. * * *↩
3. SEC. 613. PERCENTAGE DEPLETION. (a) General Rule. - In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section. (b) Percentage Depletion Rates. - The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows: * * *
(4) 10 percent - asbestos (if paragraph (2) (B) does not apply), brucite, coal, lignite, perlite, sodium chloride, and wollastonite. * * *
(c) Definition of Gross Income From Property. - For purposes of this section - (1) Gross income from the property. - The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining. * * *↩
4. Everything said herein with regard to New Garden is equally applicable to Swords Creek, which is referred to in connection with Docket Nos. 92452 and 92453.↩
***. By Tax Court order, 8/8/63, the words "at all pertinent times" were deleted. - CCH. The words "under the agreement" were added by Tax Court order, 8/8/63.↩
*. By official order of the Tax Court dated August 8, 1963 and signed by Judge Kern, the words "one operation involved in" were added. - CCH.↩
**. The words "with regard to the operation in 1959 under the agreement with Stone and Smith Coal Company" were added by the Tax Court order, 8/8/63. - CCH. ↩